[Civ. No. 21950. Fourth Dist., Div. Two. May 28, 1981.]

LAGUNA ROYALE OWNERS ASSOCIATION,
Plaintiff and Respondent, v.
STANFORD P. DARGER et al., Defendants and Appellants.

**COUNSEL**

Layman, Hanson, Jones & Voss, Rondell B. Hanson and Steven H. Sunshine for Defendants and Appellants.

Feldsott & Lee, Feldsott, Lee & Van Gemert and Martin L. Lee for Plaintiff and Respondent.

OPINION

KAUFMAN, J.—Defendants Stanford P. Darger and Darlene B. Darger (the Dargers) were the owners of a leasehold condominium[1] in Laguna Royale, a 78-unit community apartment complex on the ocean front in South Laguna Beach. The Dargers purported to assign three one-quarter undivided interests in the property to three other couples: Wendell P. Paxton and Daila D. Paxton, Keith I. Gustaveson and Elsie Gustaveson, and Keith C. Brown and Geneva B. Brown (collectively the other defendants) without the approval of Laguna Royale Owners Association (Association). Association instituted this action to obtain a declaration that the assignments from the Dargers to defendants were invalid because they were made in violation of a provision of the instrument by which the Dargers acquired the property, prohibiting assignment or transfer of interests in the property without the consent and approval of Association's predecessor in interest. Following trial to the court judgment was rendered in favor of Association invalidating the assignments from the Dargers to the other defendants. Defendants appeal.

## Facts

The Laguna Royale development is built on land leased by the developer from the landowner in a 99-year ground lease executed in 1961. As the units were completed, the developer sold each one by executing a subassignment and occupancy agreement with the purchaser. This document conveyed an undivided 1/78 interest in the leasehold estate for a term of 99 years, a right to exclusive use of a designated unit and one or more garage spaces and a right to joint use of common areas and facilities; it also contained certain restrictions. The restriction pertinent to this action is paragraph 7, which provides in relevant part: "7. Subassignee [the purchaser] shall not assign or otherwise transfer this agree-

---

[1] A "condominium" is defined in Civil Code section 783, which reads in part as follows: "A condominium is an estate in real property consisting of an undivided interest in common in a portion of a parcel of real property together with a separate interest in space in a residential, industrial or commercial building on such real property, such as an apartment, office or store ... [¶] Such estate may, with respect to the duration of its enjoyment, be either (1) an estate of inheritance or perpetual estate, (2) an estate for life, or (3) an estate for years, such as a leasehold or a subleasehold." (For a general discussion of condominiums, see Hanna, Cal. Condominium Handbook (1975); Comment, *Community Apartments: Condominium or Stock Cooperative?* (1962) 50 Cal.L.Rev. 299; Comment, *Fee in Condominium* (1964) 37 So.Cal.L.Rev. 82.)

ment, ... nor shall subassignee sublet ... without the consent of and approval of Lessee .... "[2]

Upon the sale of all units and completion of the project, the developer entered into an "Assignment Agreement" with the Association, transferring and assigning to the Association all the developer's rights, powers and duties under the subassignment and occupancy agreements, including inter alia the "right to approve or disapprove assignments or transfers of interests in Laguna Royale pursuant to Paragraph 7 of the Subassignment and Occupancy Agreements."

In 1965, Ramona G. Sutton acquired unit 41, consisting of some 3,000 square feet, by a subassignment and occupancy agreement with the developer. In 1973 the Dargers purchased unit 41 from the executrix of Mrs. Sutton's estate.[3] As owner of a unit in the project, the Dargers automatically became members of the Association and were bound by the Association's bylaws.[4]

---

[2]In full, paragraph 7 reads: "Subassignee shall not assign or otherwise transfer this agreement, or any right or interest herein, or in or to any of the buildings and improvements on the leased premises nor shall subassignee sublet said premises or any part thereof without the consent and approval of Lessee, and no assignment or transfer, whether voluntary or involuntary, by operation of law, under legal process or proceedings, by assignment for benefit of creditors, by receivership, in bankruptcy, or otherwise, and no such subletting shall be valid or effective without such consent and approval. Should Lessee consent to any such assignment, transfer or subletting, none of the restrictions of this article shall be thereby waived and the same shall apply to each successive encumbrance, assignment, transfer or subletting hereunder and shall be severally binding upon each and every assignee, transferee, subtenant and other successor in interest of subassignee. [¶] The death of subassignee shall not be deemed to effect a transfer of this agreement within the meaning of this paragraph, but the right of the successors in interest of subassignee to use and occupy the subject premises shall be subject to approval of lessee as in the case of a voluntary assignment by subassignee."

[3]The transfer was accomplished through an assignment and assumption agreement, not disputed by the parties or in issue on appeal.

[4]Article II, section 2 of the bylaws provides: "Section 2. *Ownership.* [¶] A person shall be considered to become an owner of a unit for purposes of membership in the Association upon recordation of a Subassignment and Occupancy Agreement that has been approved by the Board of Governors, by which the person acquires an undivided 1/78th interest in the leasehold covering Laguna Royale, plus the exclusive right to use and occupy an apartment to be used as a residence.

Article VII of the bylaws provides: "Section 1. *By-Laws a contract.* [¶] These By-Laws shall constitute a binding contract among the owners of units in Laguna Royale.... Section 2. *Assigns.* [¶] These By-Laws shall inure to the benefit of and be binding upon the heirs, grantees, successors, assigns, ... who agree to be bound by these By-Laws."

The Dargers reside in Salt Lake City, Utah, where Mr. Darger became a vice president of a large banking chain not long after the Dargers acquired their unit at Laguna Royale. The responsibilities of Mr. Darger's new position made it difficult for them to get away, and they attempted unsuccessfully to lease their unit through real estate agents in Laguna Beach. On October 30, 1973, Mr. Darger wrote to Mr. Yount, then chairman of the board of governors of the Association, in which he stated in part: "It has been suggested that we might sell shares in our apartment to two or three other couples here. These associates would be aware of the restrictions regarding children under 16 living there, as well as the restrictions regarding pets, and would submit themselves to the regular investigation of the Board given prospective purchasers and lessees. I would expect that the apartment will remain vacant most of the time, as now, and not more than one of the families will occupy the apartment at one time."

By letter dated November 12, 1973, Mr. Yount responded in relevant part: "Following receipt of your letter of October 30, 1973 regarding the possibility of selling shares in your apartment #41, we discussed the matter at the regular meeting of the Board of Governors held on November 10, 1973. [¶] Prior to the meeting we had referred the letter to our attorney, Mr. James Ralston Smith, for Laguna Royale Owner's Association for his opinion. We received his opinion prior to the meeting and this is quoted as follows: 'As to the request of Mr. Darger, as owner of apartment #41, to sell undivided interests in that apartment to other parties, it is my opinion that if such other parties otherwise qualified and indicate no intended use of the apartment other than single family owner's use, there would be no legal basis to refuse such transfers. However, State law restricts more than four (4) transfers of undivided interests, without qualifying as a subdivision.'"

The letter then indicated that a number of members of the board of governors had voiced some objections to multiple ownership of a unit and then stated: "The Board of Governors is quite sympathetic with your problem of being unable to lease your apartment; however, because of the reasons given above, it is our opinion that the multiple ownership would not be beneficial to the other unit owners. We believe that our opinion is shared by the majority of the unit owners of Laguna Royale. [¶] Even in view of the Boards' [sic] opinion, we would have no alternative except to approve the transfer which you suggested, providing you would comply with the legal opinion of Mr. Smith."

Thereafter Mr. Darger discussed the possibility of joint ownership with some of his associates in Salt Lake City and in late 1974 or early 1975 he reached a point where he believed he was ready to proceed. He made an appointment with John Russell Henry, then chairman of the board of governors of the Association, and met with him for the purpose of going over the agreement that Mr. Darger's Salt Lake City attorney had prepared, to make sure that everything that the board might want to be in the agreement was included from the beginning. Mr. Darger agreed in writing to pay the fees incurred by the board in having the board's attorney review the instrument.

The document prepared by Mr. Darger's attorney contemplated five owners,[5] and the board's attorney indicated both to the board and Mr. Darger personally that, in his opinion, ownership of undivided interests in the unit by more than four persons would violate California subdivision laws. Thereafter, in a letter dated November 25, 1975, to Mr. Henry, Mr. Darger stated that because of a possible violation of the subdivision laws and for other reasons, "we plan for a total of four shares, including my own."

Subsequently Mr. Darger received from Mr. Henry a letter dated January 12, 1976, which read in part: "The matter of multiple ownership of Apt. 41 has been studied in depth and detail with our own attorney, and the ultimate decision being that to do so would be contrary to recorded Lease, Subassignment and Occupancy agreement. In this connection you are respectfully requested to refer to Paragraphs 4[6] and 7 of such Agreement which limit use of units solely to residential purposes, without exception, and require written consent by your Board of Governors for any assignment thereof."

A few days later Mr. Darger received from Mr. Henry another letter dated January 16, 1976, that read in part: "The Board has determined

[5]Apparently title to the unit would have been transferred to a trustee for the benefit of the five beneficial owners.

[6]Paragraph 4 of the subassignment and occupancy agreement reads: "The premises covered hereby shall be used solely for residential purposes, and no sign of any kind shall be displayed in or upon any portions of said building. Subassignee shall not use or suffer or permit any person to use said premises, or any portion thereof, for any purpose tending to injure the reputation thereof, or to disturb the neighborhood or occupants of adjoining property, or to constitute a nuisance, or in violation of any public law, ordinance or regulation."

that the transfer as you requested would create and impose an undue, unreasonable burden and disadvantage on the other owners' and residents' enjoyment of their apartments and the common facilities. Further, your requested transfer would be contrary to and in conflict with the close community living nature of Laguna Royale and would be contrary to the single family character of the private residential purpose to which all apartments are restricted under the recorded Master Lease and the Subassignment and Occupancy Agreement, as well as the By-Laws and House Rules, by which all owners are bound."

On February 23, 1976, Mr. Darger sent a formal letter request for approval to transfer unit 41 from the Dargers to themselves and the other defendants on condition that "the three new couples subsequently receiv[e] individual approvals after a 'Request For Approval Of Sale Or Lease' form has been filed with the Board for each, and each has submitted to a personal interview by the Board for its consideration." The letter further requested that if approval was not given, "the Board specify its reasons for denial and indicate how the request made herein differs from the situation of the owners of at least two other units where there is multiple ownership between more than one party who have no family or corporate relationship, [and] in light of the written and verbal approvals for such a transfer of apartment #41 that have been extended by the Board to us over the past two and one half years."

By a letter from its attorney to the Dargers dated March 16, 1976, Association advised the Dargers that it would not consent to the requested transfer. It was denied that written and verbal approvals had been given the Dargers in the past, and it was stated in relevant part: "The reason the Association will not consent to your requested transfer is that the Board feels it is obligated to protect and preserve the private single family residential character of Laguna Royale, together with the use and quiet enjoyment of all apartment owners of their respective apartments and the common facilities, taking into consideration the close community living circumstances of Laguna Royale. [¶] The Board feels strongly about its power of consent to assignments and other transfers of leasehold interests and considers the protection and preservation of that power to be critical in maintaining the character of Laguna Royale for the benefit of all owners as a whole. A four family ownership of a single apartment, with the guests of each owner potentially involved, would compound the use of the apartment and common facilities well beyond the normal and usual private single family residential character to the detriment of other owners and would frustrate effective

controls over general security, guest occupants and rule compliance, as has been the case in the past. [¶] Provision 7 of the Subassignment and Occupancy Agreement, under which all apartment leasehold interests are held, requires the unqualified consent to any transfer. Provision 10 of said agreement provides for the termination of the leasehold interest in the event of a violation of Provision 7, or other breach. . . . [¶] No apartments in Laguna Royale are held by multiple families in the manner that you have requested. In any event, any consents given by the Association to transfers in the past cannot be regarded as setting any precedent or in any way limiting or impairing the power of the Association to refuse its consent to any present or future transfer. In this regard, the language of Provision 7 of the Subassignment and Occupancy Agreement provides that consent given to any particular transfer shall not operate as a waiver for any other transfer."

After consultation with legal counsel the Dargers proceeded nevertheless, and on June 11 they executed instruments purporting to assign undivided one-fourth interests in the property to themselves and the other three couples. The instruments were recorded on June 30, and on July 3, 1976, the Dargers informed Association by letter of the transfers inclosing on Association's forms a separate "Request For Approval Of Sale Or Lease" and financial statement prepared and executed by each of the other couples. These papers show that the other defendants all reside in Salt Lake City, Utah. Each executed request form contains a warranty by the purchaser that if the application is approved no child under 16 years of age "will make residency at this property" and an agreement that the purchaser "will abide by and conform to the terms and conditions of the master lease, . . . all amendments described in the Subassignment and Occupancy Agreement . . . and the By-Laws of the Laguna Royale Owners . . . Association."

After unsuccessfully demanding that the other defendants retransfer their purported interests to the Dargers, the Association filed this action.

At trial the testimony confirmed that no more than one family of defendants used the property at a time and, although the matter was not examined in detail, answers to questions by one or more defendants indicated that thirteen-week periods had been agreed upon for exclusive use by each of the four families. It was also indicated that for substantial periods during the year, no use at all was being made of the unit. The evidence also showed that a number of Laguna Royale units were

owned by several unrelated persons, but that in each case the owners used the unit "as a family."

No formal findings were made. However, in its notice of intended decision the court stated in relevant part: "The Court concludes that the Subassignment and Occupancy Agreement, ... is in law a sublease. ... Therefore, Civil Code Section 711 does not apply to void the requirement that consent be given to the transfer of defendant Darger's interest. The provisions of Title 10 of the Administrative Code, Section 2792.25, as cited in *Ritchey* v. *Villa Nueva Condominiums* [(1978)] 81 CA (3) 688, only govern the restrictions of condominiums by laws, and not restrictions that may exist because of leasehold interests. The plaintiff association had the right to approve any transfer of defendant Darger's interest. The Court finds that the plaintiff association acted reasonably in refusing to grant consent to the proposed transfer by Darger to the other defendants. Plaintiff is entitled to a declaration that the assignments by Darger to the other defendants are invalid. Plaintiff is awarded attorney fees in the amount of $2500."

Judgment was entered accordingly.

### Contentions, Issues and Discussion

Defendants contend paragraph 7 of the subassignment and occupancy agreement prohibiting assignments or transfers without the consent of Association is invalid because it is in violation of their constitutional rights to associate with persons of their choosing (U.S. Const., 1st Amend.; Cal. Const., art. I, § 1), because it constitutes an unlawful restraint on alienation (Civ. Code, § 711), and because it does not comply with a regulation of the Real Estate Commissioner (Cal. Admin. Code, tit. 10, § 2792.25). Failing those, defendants contend finally that if by its finding that Association acted reasonably in refusing to approve the transfers, the court meant to indicate that Association had the duty to act reasonably in withholding consent and did so, that determination is not supported by substantial evidence and is contrary to law.

Association contends that the prohibition against transfer or assignment without its consent is not invalid on any of the bases urged by defendants. It argues primarily that its right to withhold approval or consent is absolute, that in exercising its power it is not required to adhere to a standard of reasonableness but may withhold approval or consent for any reason or for no reason at all. Secondarily, it argues

that the evidence supports the finding it acted reasonably in disapproving the transfers to the other defendants.

 We reject Association's contention that its right to give or withhold approval or consent is absolute. We likewise reject defendants' contention that the claimed right to approve or disapprove transfers is an invalid restraint on alienation because it is repugnant to the conveyance of a fee. We hold that in exercising its power to approve or disapprove transfers or assignments Association must act reasonably, exercising its power in a fair and nondiscriminatory manner and withholding approval only for a reason or reasons rationally related to the protection, preservation and proper operation of the property and the purposes of Association as set forth in its governing instruments. We hold that the restriction on transfer contained in paragraph 7 of the subassignment and occupancy agreement (hereafter simply paragraph 7), thus limited, does not violate defendants' constitutional rights of association and is not invalid as an unreasonable restraint on alienation.

 However, we conclude that in view of the present provisions of Association's bylaws, its refusal to consent to the transfers to defendants was unreasonable as a matter of law. Accordingly, we reverse the judgment with directions to enter judgment for defendants. Having so concluded and disposed of the appeal it is unnecessary for us to decide whether the Real Estate Commissioner's regulation, which was not in effect when the subassignment and occupancy agreement here involved was executed, could validly be applied to paragraph 7 or whether, if applied, it would invalidate the provisions of paragraph 7.

As indicated, the initial positions of the parties are at opposite extremes. Association contends that the subassignment and occupancy agreement constitutes a sublease and that under the law applicable to leasehold interests, when a lease contains a provision permitting subletting only upon consent of the lessor, the lessor is under no obligation to give consent and, in fact, may withhold consent arbitrarily. (See, e.g., *Richard* v. *Degen & Brody, Inc.* (1960) 181 Cal.App.2d 289, 298-299 [5 Cal.Rptr. 263]; 4 Miller & Starr, Current Law of Cal. Real Estate, § 27:92, pp. 415-416; see also cases cited in Annot. (1953), 31 A.L.R.2d 831.) Defendants on the other hand contend that the subassignment and occupancy agreement conveys, in essence, a fee,[7] and that

---

[7]It is unclear to us how the subassignment and occupancy agreement could convey a fee interest when the entire interest in the land underlying the development is only a 99-year ground lease. It would appear that defendants' argument more appropriately ought to be that once consent was given pursuant to the subassignment and occupancy

under California law when a fee simple interest is granted, any restriction on the subsequent conveyance of the grantee's interest contained in the original grant is repugnant to the interest conveyed and is therefore void. (See, e.g., *Murray* v. *Green* (1883) 64 Cal. 363, 367 [28 P. 118]; *Title Guarantee & Trust Co.* v. *Garrott* (1919) 42 Cal.App. 152, 155 [183 P. 470]; see also 3 Witkin, Summary of Cal. Law (8th ed. 1973) Real Property, § 314, p. 2023.)

■ We reject the extreme contentions of both parties; the rules of law they propose, borrowed from the law of landlord and tenant developed during the feudal period in English history (see *Green* v. *Superior Court* (1974) 10 Cal.3d 616, 622 [111 Cal.Rptr. 704, 517 P.2d 1168]), are entirely inappropriate tools for use in effecting an accommodation of the competing interests involved in the use and transfer of a condominium. Even assuming the continued vitality of the rule that a lessor may arbitrarily withhold consent to a sublease (but see Note, *Effect of Leasehold Provision Requiring the Lessor's Consent to Assignment* (1970) 21 Hastings L.J. 516), there is little or no similarity in the relationship between a condominium owner and his fellow owners and that between lessor and lessee or sublessor and sublessee. Even when the right to the underlying land is no more than an undivided interest in a ground lease or sublease, ownership of a condominium constitutes a statutorily recognized estate in real property (see Civ. Code, § 783 [see fn. 1, *ante*]), and in our society the right freely to use and dispose of one's property is a valued and protected right. (U.S. Const., Amends. 5 and 14; Cal. Const., art. I, § 7, subd. (a); see 5 Witkin, Summary of Cal.Law (8th ed. 1974) Constitutional Law, § 273, p. 3563.) Ownership and use of condominiums is an increasingly significant form of "home ownership" which has evolved in recent years to meet the desire of our people to own their own dwelling place, in the face of heavy concentrations of population in urban areas, the limited availability of housing, and, thus, the impossibly inflated cost of individual homes in such areas.

On the other hand condominium living involves a certain closeness to and with one's neighbors, and, as stated in *Hidden Harbour Estates, Inc.* v. *Norman* (Fla.App. 1975) 309 So.2d 180, 181-182: "[I]nherent in the condominium concept is the principle that to promote the health,.

agreement to the transfer from the estate of Ramona Sutton to the Dargers, the rule in *Dumpor's Case* (1578) 76 Eng.Rep. 1110, became applicable and that thereafter no consent to any further assignment was required. (See 3 Witkin, Summary of Cal. Law (8th ed. 1973) Real Property, § 491, p. 2170.)

happiness, and peace of mind of the majority of the unit owners since they are living in such close proximity and using facilities in common, each unit owner must give up a certain degree of freedom of choice which he might otherwise enjoy in separate, privately owned property." (See also *White Egret Condominium* v. *Franklin* (Fla. 1979) 379 So.2d 346, 350; *Seagate Condominium Association, Inc.* v. *Duffy* (Fla.App. 1976) 330 So.2d 484, 486.) Thus, it is essential to successful condominium living and the maintenance of the value of these increasingly significant property interests that the owners as a group have the authority to regulate reasonably the use and alienation of the condominiums.

Happily, there is no impediment to our adoption of such a rule; indeed, the existing law suggests such a rule. In the only California appellate decision of which we are aware dealing with the problem of restraints on alienation of a condominium, *Ritchey* v. *Villa Nueva Condominium Assn., supra*, 81 Cal.App.3d 688, 695 [146 Cal.Rptr. 695], the court upheld as a reasonable restriction on an owner's right to sell his unit to families with children, a duly adopted amendment to the condominium bylaws restricting occupancy to persons 18 years and over. And, of course, Civil Code section 1355 pertaining to condominiums expressly authorizes the recordation of a declaration of project restrictions and subsequent amendments thereto, "which restrictions shall be enforceable equitable servitudes where reasonable, and shall inure to and bind all owners of condominiums in the project."

Reasonable restrictions on the alienation of condominiums are entirely consistent with Civil Code section 711 in which the California law on unlawful restraints on alienation has its origins.[8] The day has long since passed when the rule in California was that all restraints on alienation were unlawful under the statute; it is now the settled law in this jurisdiction that only unreasonable restraints on alienation are invalid. (*Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943, 948-949 [148 Cal.Rptr. 379, 582 P.2d 970]; *La Sala* v. *American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 878-879 [97 Cal.Rptr. 849, 489 P.2d 1113]; *Coast Bank* v. *Minderhout* (1964) 61 Cal.2d 311, 316 [38 Cal.Rptr. 505, 392 P.2d 265], overruled to the extent inconsistent in *Wellenkamp* v. *Bank of America, supra*, 21 Cal.3d at p. 953.)

---

[8]Civil Code section 711 reads: "Conditions restraining alienation, when repugnant to the interest created, are void."

Nor does the right of Association reasonably to approve or disapprove the assignment or transfer of the Dargers' ownership interest violate defendants' constitutional right to associate freely with persons of their choosing. Preliminarily, there is considerable doubt of whether the actions of Association constitute state action so as to bring into play the constitutional guarantees. (Cf. *Moose Lodge No. 107* v. *Irvis* (1972) 407 U.S. 163, 173 [32 L.Ed.2d 627, 637, 92 S.Ct. 1965]; *Newby* v. *Alto Riviera Apartments* (1976) 60 Cal.App.3d 288, 293-295 [131 Cal.Rptr. 547]; see generally 5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 338, pp. 3631-3632.) ▌ In any event, however, the constitutionally guaranteed freedom of association, like most other constitutionally protected rights, is not absolute but is subject to reasonable restriction in the interests of the general welfare. (*Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1, 9 [39 L.Ed.2d 797, 804, 94 S.Ct. 1536, 1541]; *White Egret Condominium* v. *Franklin, supra,* 379 So.2d at pp. 349-351.) Moreover, it may be persuasively argued that if any constitutional right is at issue it is the due process right of an owner of property to use and dispose of it as he chooses. (See generally 5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 273, p. 3563.) ▌ And, of course, property rights are subject to reasonable regulation to promote the general welfare. (*Home Building & Loan Asso.* v. *Blaisdell* (1934) 290 U.S. 398, 428, 434-436 [78 L.Ed. 413, 423, 426-428, 54 S.Ct. 231]; *Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 305 [152 Cal.Rptr. 903, 591 P.2d 1]; *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 592 [128 Cal.Rptr. 427, 546 P.2d 1371].) Finally, any determination of the validity or invalidity of Association's right to approve or disapprove assignments or transfers of the Dargers' interest will of necessity impinge upon someone's constitutional freedom of association. A determination that the power granted the Association is invalid would adversely affect the constitutional right of association of the remaining owners at least as much as a contrary determination would affect the same right of the Dargers. (Cf. *Presbytery of Riverside* v. *Community Church of Palm Springs* (1979) 89 Cal.App.3d 910, 925 [152 Cal.Rptr. 854].)

Having concluded that a reasonable restriction on the right of alienation of a condominium is lawful, we must now determine whether Association's refusal to approve the transfer of the Dargers' interest to the other defendants was reasonable in the circumstances of the case at bench. ▌ The criteria for testing the reasonableness of an exercise of such a power by an owners' association are (1) whether the reason

for withholding approval is rationally related to the protection, preservation or proper operation of the property and the purposes of the Association as set forth in its governing instruments and (2) whether the power was exercised in a fair and nondiscriminatory manner. (Cf. *Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 550 [116 Cal.Rptr. 245, 526 P.2d 253]; *Lewin* v. *St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 388 [146 Cal.Rptr. 892]; *Ascherman* v. *Saint Francis Memorial Hosp.* (1975) 45 Cal.App.3d 507, 511-512 [119 Cal.Rptr. 507].) Another consideration might be the nature and severity of the consequences of application of the restriction (e.g., transfer declared void, estate forfeited, action for damages). (See 3 Witkin, Summary of Cal. Law (8th ed. 1974) Real Property, § 315, p. 2025; Rest. Property, §§ 404-406.)

As to the last observation, a potential problem in the case at bench was avoided by the nature of the relief granted in the court below. Although in its complaint Association asserted a right to terminate the Dargers' ownership interest because of their assignments without board approval and although there is some reference in the briefs to a "forfeiture," the judgment of the trial court simply invalidated the transfers to the other defendants, leaving the Dargers as the owners of the unit as they were at the outset. If Association's disapproval of the transfers were otherwise reasonable, we would find nothing unreasonable in the invalidation of the transfers.

To determine whether or not Association's disapproval of the transfers to the other defendants was reasonable it is necessary to isolate the reason or reasons approval was withheld. Aside from the assertion that it had the power to withhold approval arbitrarily, essentially three reasons were given by the Association for its refusal to approve the transfers: (1) the multiple ownership of undivided interests; (2) the use the defendants proposed to make of the unit would violate a bylaw restricting use of all apartments to "single family residential use"; and (3) the use proposed would be inconsistent with "the private single family residential character of Laguna Royale, together with the use and quiet enjoyment of all apartment owners of their respective apartments and the common facilities, taking into consideration the close community living circumstances of Laguna Royale." As to (3) Association asserted: "A four family ownership of a single apartment, with the guests of each owner potentially involved, would compound the use of the apartment and common facilities well beyond the normal and usual private single

family residential character to the detriment of other owners and would frustrate effective controls over general security, guest occupants and rule compliance, . . ." We examine each of these reasons in light of the indicia of reasonableness referred to above.

Insofar as approval was withheld based on multiple ownership alone, Association's action was clearly unreasonable. In the first place, multiple ownership has no necessary connection to intensive use. Twenty, yea a hundred, persons could own undivided interests in a condominium for investment purposes and lease the condominium on a long-term basis to a single occupant whose use of the premises would probably be less intense in every respect than that considered "normal and usual." Secondly, the Association bylaws specifically contemplate multiple ownership; in section 7 of article III, dealing with voting at meetings, it is stated: "Where there is more than one record owner of a unit, any or all of the record owners may attend [the meeting] but only one vote will be permitted for said unit. In the event of disagreement among the record owners of a unit, the vote for that unit shall be cast by a majority of the record owners." Finally, the evidence is uncontroverted that a number of units are owned by several unrelated persons. Although those owners at the time of trial used their units "as a family," there is nothing in the governing instruments as they presently exist that would prevent them from changing the character of their use.

We turn to the assertion that the use of the premises proposed by defendants would be in violation of section 1 of article VIII of the bylaws which provides: "All apartment unit uses are restricted and limited to single family residential use and shall not be used or occupied for any other purpose" and paragraph 4 of the subassignment and occupation agreement which provides: "The premises covered hereby shall be used solely for residential purposes, . . ." ▇ The term "single family residential use" is not otherwise defined, and if there is any ambiguity or uncertainty in the meaning of the term it must be resolved most favorably to free alienation. (*Randol* v. *Scott* (1895) 110 Cal. 590, 595-596 [42 P. 976]; *Burns* v. *McGraw* (1946) 75 Cal.App.2d 481, 485-486 [171 P.2d 148]; *Riley* v. *Stoves* (1974) 22 Ariz.App. 223 [526 P.2d 747, 749].) Actually, there is no evidence that defendants proposed to use the property other than for single family residential purposes. It is uncontroverted that they planned to and did use the property one family at a time for residential purposes. Thus, the proposed use was not in

violation of the restriction to single family residential use.[9] (*White Egret Condominium* v. *Franklin, supra*, 379 So.2d at p. 352.)

■ The reasonableness of Association's disapproval of the transfers from the Dargers to the other defendants must stand or fall in the final analysis on the third reason offered by the Association for its action: the prospect that defendants' proposed use of the apartment and common facilities would be so greatly in excess of that considered "usual and normal" as to be inconsistent with the quiet enjoyment of the premises by the other occupants and the maintenance of security.[10]

There can be no doubt that the reason given is rationally related to the proper operation of the property and the purposes of the Association as set forth in its governing instruments. The bylaws provide that "[t]he purpose of the Association is to manage and maintain the community apartment project . . . on a non-profit basis for the benefit of all owners of Laguna Royale." By subdivision (M)(6) of section 2 of article V of the bylaws the board is empowered to "prescribe reasonable regulations pertaining to . . . [r]egulating the purchase and/or lease of an apartment to a buyer or sublessee who has no children under 16 years of age that will occupy the apartment temporarily or full time as a resident." This power is said by the bylaws to be given the board in recognition of "the prime importance of both security and quiet enjoyment of the Apartments owned by each member, and of the common recreational areas. . . ."

We reject defendants' contention that the Association had established a practice of approving or disapproving transfers solely on the basis of factors relating to the character, reputation and financial responsibility of the proposed transferee. There was testimony that during personal

---

[9]In the trial court counsel for Association argued that "single family residential use" meant the same thing as "single family residential" customarily found in zoning ordinances, typically in connection with the zoning designation R-1. We cannot conceive a decision that the ownership of a private dwelling in an R-1 zone by four families to be used by each family thirteen weeks each with no use being made by more than one family at any time would be a use in violation of the R-1 zoning. We note also that our conclusion is in accord with the opinion originally expressed by the attorney for the Association that under the existing governing instruments there was nothing the board could do legally to prevent multiple ownership if the interests were no smaller than quarter interests.

[10]It is probable that this was the principal reason Association refused to approve the transfers. Defendants' proposed use of the unit has been characterized from time to time during these proceedings as "time sharing."

interviews with proposed transferees, the board always inquired into the use proposed to be made of the premises.

The difficulty with upholding the Association's disapproval of the transfers by the Dargers to the other defendants is twofold. First, no evidence was introduced to establish that the intensity or nature of the use proposed by defendants would in fact be inconsistent with the peaceful enjoyment of the premises by the other occupants or impair security. We may take judicial notice as a matter of common knowledge that the use of a single apartment by four families for thirteen weeks each during the year would create some problems not presented by the use of a single, permanent resident family. The moving in and out would, of course, be more frequent, and it might be that some temporary residents would not be as considerate of their fellow occupants as more permanent residents. However, we are not prepared to take judicial notice that the consecutive use of unit 41 by these four families, one at a time, would be so intense or disruptive as to interfere substantially with the peaceful enjoyment of the premises by the other occupants or the maintenance of building security.

Secondly, and most persuasive, a provision of the bylaws, subdivision (A) of section 1 of article VIII, provides: "Residential use and purpose, as used herein and as referred to in the lease, sub-assignment and occupancy agreement pertaining to and affecting each apartment unit in LAGUNA ROYALE shall be and is hereby deemed to exclude and prohibit the rental of any apartment unit for a period of time of less than ninety (90) days, as it is deemed and agreed that rentals of apartment units for less than ninety (90) day periods of time are contrary to the close community apartment character of LAGUNA ROYALE; interfere with and complicate the orderly administration and process of the security system and program and maintenance program of LAGUNA ROYALE, and interfere with the orderly management and administration of the common areas and facilities of LAGUNA ROYALE. Accordingly, no owner shall rent an apartment unit for a period of time of less than ninety (90) days."

The point is self-evident: under the present bylaws the Dargers could effect the same *use* of the property as is proposed by defendants by simply leasing to each couple for a period of 90 days each year.[11]

---

[11]We note that on the form supplied by the board to be filled in and executed by proposed purchasers or lessees, it is indicated that no lease less than six months in duration

Under these circumstances we are constrained to hold that board's refusal to approve the transfers to the other defendants on the basis of the prospect of intensified use was unreasonable as a matter of law.

Our conclusion that Association's disapproval of the transfers by the Dargers to the other defendants must be characterized as unreasonable as a matter of law disposes of the appeal, and it is unnecessary for us to deal with the applicability of the regulation of the Real Estate Commissioner which provides that bylaw restrictions on sale or lease of a condominium must include uniform, objective standards not based upon "the race, color, religion, sex, marital status, national origin or ancestry of the vendee or lessee," and which, in effect, requires an owners' association to buy out the owner's interest on the terms of the proposed sale if the Association disapproves "a bona fide offer by a person who does not meet the prescribed standards." (Cal. Admin. Code, tit. 10, § 2792.25, subds. (a), (b); see *Richey* v. *Villa Nueva Condominium Assn., supra*, 81 Cal.App.3d at pp. 694-695.) We do observe that the transfers from the Dargers were not disapproved on the basis that the other defendants are not "person[s] who [do] not meet the prescribed standards." We further observe that the regulation in question was apparently first filed in January 1976 whereas the subassignment and occupancy agreement involved in the case at bench was executed by the defendants' predecessor in interest in 1965 and assigned to the Dargers in 1973. Finally, we observe that insofar as the necessity of exercising the right to approve or disapprove sales or leases on the basis of uniform, objective standards is concerned, our decision is substantially in accord with the commissioner's regulation.

### Disposition

The judgment is reversed with directions to the trial court to enter judgment for the defendants.

McDaniel, J., concurred.

**GARDNER, P. J.**—I dissent.

Stripped to its essentials, this is a case in which the other owners of a condominium are attempting to stop the owner of one unit from em-

---

will be approved. While the board is authorized by the bylaws to promulgate regulations concerning sales and leases of the units, its regulations must be consistent with the bylaws and cannot supersede or, in effect, amend a provision of the bylaws. The bylaws provide that they may be amended only by majority vote of the owners.

barking on a time sharing enterprise. The majority properly conclude that the owners as a group have the authority to regulate reasonably the use and alienation of the units. The majority then conclude that the board's refusal to approve this transfer was unreasonable as a matter of law. To the contrary, I would find it to be entirely reasonable and would affirm the judgment of the trial court.

The use of a unit on a time sharing basis is inconsistent with the quiet enjoyment of the premises by the other occupants. Time sharing is a remarkable gimmick. P. T. Barnum would have loved it. It ordinarily brings enormous profits to the seller and in this case would bring chaos to the other residents. Here we have only 4 occupants but if this transfer is permitted there is nothing to stop a more greedy occupant of a unit from conveying to 52 or 365 other occupants.

If as an occupant of a condominium I must anticipate that my neighbors are going to change with clocklike regularity I might just as well move into a hotel—and get room service.

Respondent's petition for a hearing by the Supreme Court was denied August 26, 1981.