Filed 7/6/21  Country Glen Oak Park etc. v. Garrett CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| COUNTRY GLEN OAK PARK HOMEOWNERS ASSOCIATION,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRETT GARRETT et al.,<br><br>    Defendants and Appellants. | 2d Civ. No. B303220<br>(Super. Ct. No. 56-2017-00497633-CU-BC-VTA)<br>(Ventura County) |

In an action by a homeowner association against two members of the association, the trial court ordered the members to remove an encroachment from the common area, awarded the association $820 damages, issued a restraining order against one of the members, and awarded the association attorney fees.  We affirm.

## FACTS

County Glen Oak Park is a common interest development of 239 homes subject to the Davis-Stirling Common Interest

Development Act (Davis-Sterling Act). (Civ. Code, § 4000 et seq.)[1] The development is governed by the Country Glen Oak Park Homeowners Association (Association) and subject to recorded covenants, conditions, and restrictions (CC&R's). The daily operations of the Association were conducted by a management company. Tami Chavin was the principal managing agent for the Association.

Laurie and Brett Garrett purchased their parcel in 2001. It sits on a hillside overlooking the Conejo Valley. A boundary line runs across the Garretts' backyard separating the Garretts' property from the common area managed by the Association. A metal fence also runs across the Garretts' backyard, but it does not mark the boundary line. Most of the fence is in the common area outside of the Garretts' property. The hillside falls steeply away beyond the fence.

<em>Application to Construct a Pool</em>

The CC&R's and the Association's rules require a homeowner to obtain approval from the Association's architectural committee before beginning any construction on the property. The form application used by the Association asked applicants to identify the location of the improvement on a plot plan with reference to the fence line, not the property line. The Association's board members and Chavin generally understood that the fences were not on the property lines.

The Garretts submitted an application for a pool and related equipment to be constructed in their backyard. The committee rejected the original application because the plans were too vague and because professional plans are required for such a large project.

---

[1] All statutory references are to the Civil Code.

2.

The Garretts submitted an application with professionally drawn plans showing the location of the pool and equipment. The plans show an unlabeled straight line perpendicular to the pool. The Garretts contended the line represents the fence. But the fence is not straight; the property line is. The Garretts stated on the application that it is only for a pool, and that other possible improvements will be considered at another time. The committee approved the application.

Neighbor's Concerns

The Garretts' neighbor, Randy Hermes, observed two things about the construction that concerned him. First, construction workers removed the fence, pushed dirt out toward the slope and regraded part of the Garretts' backyard. When the workers replaced the fence, the base was buried deeper into the ground, causing the height of the fence to be lower. Second, Hermes saw pipes coming from out of the ground near the pool area. He inferred that the pool equipment would be located in that area and that it would encroach into the common area.

Hermes had a rough idea where the boundary lines were located from his dealings with the developer many years before. He also had documents identifying the location of the boundaries.

Hermes spoke with Brett Garrett over the fence between their properties. Hermes expressed his concerns, and Garrett promised that he would "make things right." Hermes provided Garrett with the documents showing the location of the boundary lines.

After a few weeks Hermes saw that the Garretts were not addressing his concerns. He contacted Chavin and showed her photographs and documents. Chavin observed the construction from Hermes's backyard.

*Association's Actions*

On August 1, 2016, Chavin e-mailed the Garretts, stating that she has pictures to show they have "replaced and moved the wrought iron fence beyond its original location and that the [pool] equipment is not on [their] property." She invited comment, but there was no response.

Two days later Chavin wrote the Garretts a letter, demanding that they cease and desist the improvements that were not part of their approved application. The letter referenced the changes to the slope and the encroachment of the pool equipment into the common area. The letter stated that the board will schedule a hearing on the matter.

On August 8, 2016, Brett Garrett spoke with Chavin on the telephone. He was angry and verbally abusive. Chavin decided she would not speak with Brett Garrett on the telephone again.

On August 11, 2016, some of the board members met with the Garretts on their property to conduct an inspection. They inspected the property and listened to the Garretts. Brett Garrett aggressively questioned the board members. But he was told the board was there only to conduct an investigation, not to answer the Garretts' questions.

On August 16, 2016, Chavin wrote to the Garretts, clarifying that the cease and desist order applied only to improvements other than the pool.

On the same day, Chavin served notice on all the homeowners of an executive session of the board to be held on August 21, 2016. The purpose of the meeting was identified only as "to discuss legal matters." Prior to the meeting, Brett Garrett requested permission to attend the meeting. Chavin replied that the meeting was for board members only. But she assured

Garrett that the board would be meeting in September, and that she would shortly provide him with the date.

The board discussed the Garretts' construction in executive session on August 21, 2016. The discussion resulted in a letter to the Garretts from Chavin dated August 22, 2016. The letter demanded that the Garretts return the slope to its original condition; retain an engineer to ensure the slope was returned properly; relocate the fence to its original placement and height; move the pool equipment to within their property; and provide the board with as-built plans for the pool. The letter stated that the board requires completion of these items within 45 days.

Brett Garrett wrote to Chavin. He admitted to being livid at how the matter had been handled. Chavin told him he should speak with the board. Chavin sent the Garretts notice that a board meeting would be held on September 6, 2016.

The Garretts e-mailed board member Drew Fountaine. Fountaine replied that in the interest of maintaining complete integrity, he would not meet with the Garretts individually. He would discuss the matter only in the company of the board at a proper meeting. The next meeting would be on September 6 at 6:00 p.m. Fountaine said, "It is possible . . . that we will schedule an executive session for the sole purpose of discussing this matter with you and/or [Laurie Garrett] but it is uncertain at this time."

The meeting was held on September 6, as scheduled. But the Garretts did not appear. Homeowners who attended expressed concern about work on the common area by the Garretts. They also expressed fear for their safety due to outbursts by Brett Garrett.

The day after the meeting Laurie Garrett wrote Chavin that they did not attend the meeting because Fountaine said it

5.

was only a possibility that the Garretts' problem would be discussed.

In spite of the cease and desist order, the Garretts' project had blossomed into a complete backyard renovation with retaining walls, stairs, a drainage system, patio pavers, and planter beds. None of those improvements were part of the Garretts' application for architectural committee approval.

On October 3, 2016, Chavin wrote to the Garretts about their expanded project and their refusal to cease and desist. She stated that the board was working hard to meet with them, and the board would turn the matter over to counsel unless they ceased until an agreement is reached. She said the Garretts could meet with the board on October 13, 2016, to resolve the issue.

The Garretts met with the board on October 13. Brett Garrett was hostile and angry. He left the meeting. Laurie Garrett remained at the meeting and agreed with the board for a retention of an expert. She agreed that if the expert found the pool equipment was over the property line, the Garretts would pay the expert; if the exert found the equipment was not over the property line, the Association would pay. Within hours, Laurie Garrett e-mailed Chavin that she was retracting her agreement. The Garretts asked for a private meeting with the board.

On October 31, 2016, Brett Garrett wrote to Chavin notifying her that their backyard improvements are complete, and that they would like the board to inspect and certify that all work is correct and legal.

The board scheduled an executive meeting for November 17, 2016, to meet privately with the Garretts. Hours before the

meeting, however, the Garretts notified the board that they would not attend.

The board held the meeting without the Garretts. The next day Chavin wrote to the Garretts summarizing the board's conclusion. The board decided to retain and advance payment for an expert. If the expert determined that the pool equipment encroached onto the common area, and the Garretts refused to reimburse the Association for the expert's fee, the board would nevertheless seek reimbursement from the Garretts.

In early December 2016, Laurie Garrett notified Chavin by e-mail that the Garretts would be attending the December 22, 2016, board meeting. She asked Chavin why the board had not come to their property. Chavin replied that the board would not come because of Brett Garrett's erratic and abusive behavior.

At the December 22, 2016, board meeting, the Garretts agreed to allow an expert retained by the board to conduct an inspection and survey of their property.

Notwithstanding the agreement, the Garretts refused to allow the expert access to their property.

### Judgment

The trial court issued a mandatory injunction requiring the Garretts to remove the pool equipment and pad from the common area within 60 days.

The trial court awarded $820 in compensatory damages against the Garretts for damage to the fence.

The trial court issued a restraining order against Brett Garrett enjoining him from confronting, intimidating, annoying, harassing, threatening, challenging, provoking, or assaulting any member of the Association, its agents or employees of its contractors, including its management agency.

7.

The trial court found the Association to be the prevailing party.  The court awarded the Association $318,426 in attorney fees.

## DISCUSSION

### I

### *Section 5855*

The Garretts contend the trial court's order to move the pool equipment and pad is void under section 5855.

Section 5855 is part of the Davis-Stirling Act.  Subdivision (a) provides:  "When the board is to meet to consider or impose discipline upon a member, or to impose a monetary charge as a means of reimbursing the association for costs incurred by the association in the repair of damage to common area and facilities caused by a member or the member's guest or tenant, the board shall notify the member in writing, by either personal delivery or individual delivery pursuant to Section 4040, at least 10 days prior to the meeting."

Section 5855, subdivision (d) provides:  "A disciplinary action or the imposition of a monetary charge for damage to the common area shall not be effective against a member unless the board fulfills the requirements of this section."

The Garretts argue that the trial court erred in concluding that the board's efforts to get them to comply with the CC&R's was not "discipline" within the meaning of section 5855, subdivision (a).

The trial court concluded the term "discipline," as used in the statute, means "punishment."  The Association did not seek to impose any punishment or sanction on the Garretts.  All the Association wanted was compliance with the CC&R's.  The Garretts claim that discipline can include "control gained by

8.

enforcing obedience or order." (Citing https://www.merriamwebster.com/dictionary/discipline.) But the usual and ordinary meaning of "discipline" involves the imposition of punishment or sanction. (See *MCI Communications Services, Inc. v. California Dept. of Tax & Fee Administration* (2018) 28 Cal.App.5th 635, 643 [in interpreting a statute, we give the words their usual and ordinary meaning].)

But we need not make a definitive construction of the statute. Assuming section 5855 applies to the Association's demand for compliance with the CC&R's, the Association substantially complied with the statute. Where there is compliance with a statute in all matters of substance, the substance will prevail over form, and technical deviations will be ignored. (*Manderson-Saleh v. Regents of University of California* (2021) 60 Cal.App.5th 674, 701.)

The purpose and substance of section 5855 is to give the member notice and an opportunity to be heard before discipline is imposed. The Garretts had more than ample notice and an opportunity to be heard.

The Garretts received notice of the September 6, 2016, meeting, but chose not to attend. They gave the thin excuse that there was only a possibility of meeting in executive session with the board. They point to no rule requiring the board to meet with them in executive session, as opposed to an open meeting.

Even discounting the September 6 meeting, the Garretts had notice and three other opportunities to address the board and resolve the matter. At the October 13, 2016, meeting, Brett Garrett was hostile and angry and walked out of the meeting. Within hours of the meeting, the Garretts gave notice that they would not honor an agreement that Laurie Garrett made at the

meeting. The Garretts were given notice of a November 17, 2016, meeting with the board. They simply refused to attend. Finally, the Garretts met with the board on December 22, 2016. They made an agreement to allow an expert to inspect their property. But they refused to honor that agreement.

The Association went far beyond any duty it may have had under section 5855. The Association's board scheduled multiple meetings with the Garretts. Either the Garretts did not appear, or, when they did appear, Brett Garrett walked out. The board tried to fashion reasonable solutions, but even when the Garretts would agree, the Garretts refused to honor the agreements they made. The Garretts made it abundantly clear to the board that they would do whatever they wanted to do and further notice and hearings would be a waste of time.

## II

### *Regular, Fair, and Reasonable Treatment*

The Garretts contend the Association did not address the violations in a regular, fair, and reasonable manner.

When a homeowners association seeks to enforce provisions of its CC&R's, it must follow its own procedures; the procedures must be fair and reasonable; and the substantive decision must be made in good faith, reasonable, and not arbitrary or capricious. (*Ironwood Owners Assn. IX v. Solomon* (1986) 178 Cal.App.3d 766, 772.)

The Garretts complain that the architectural committee's form application required that the plans be measured from the fence line not the property line. But the plans the Garretts submitted showed the property line. Although the line is not labeled, the trial court pointed out that the property line is a straight line, whereas the fence line is not straight. Brett

Garrett is a general contractor. He is not naïve. The court did not believe he was unaware of the location of the property line. Even assuming the improbable that the Garretts initially did not know the location of the property line, Hermes informed them and provided them with documents.

It is true the trial court found that the Association did not act with strict adherence to the proper procedure. But the court placed the blame squarely on the Garretts. The trial court found:

"From the outset, the board's legitimate attempts to determine whether the pool equipment was built entirely on the Garrett's property were ostructed [*sic*] by the Garretts' abusive and threatening conduct. Chavin and board members testified that they feared Mr. Garrett. Their fear was both genuine and justified. It is clear to the court that the Garretts, rather than working collaboratively with the board to facilitate a fair process for resolving this issue, engaged in a calculated attempt to prevent that process. This included Mr. Garrett's ongoing efforts to harass and frighten Chavin, board members, and members of the association who had spoken out against the Garretts. It also included the Garretts' pattern of making promises and then breaking them. It included statements concerning the scope of the Garretts' work that were untrue and that the Garretts knew were untrue. So although it may be concluded that the board failed to address the matter of the encroachment 'by the book,' the reason for that was predominantly a result of the Garretts' effort to obstruct the board from engaging in an orderly process. Having purposefully created chaos, the Garretts can hardly be heard to complain if the process of resolving their dispute was neither linear nor perfect.

11.

"The court is persuaded that the process followed by the board concerning the issue of the encroachment was fundamentally reasonable under the circumstances created by the Garretts."

The Association did its best to address the violations in a regular, fair, and reasonable manner in spite of the Garretts' obstructive behavior.

## III

### *Selective Enforcement*

The Garretts contend that the Association selectively enforced the CC&R's against them.

The Association must exercise its power in a fair and nondiscriminatory manner. (*Laguna Royale Owners Assn. v. Darger* (1981) 119 Cal.App.3d 670, 684.) But in determining whether the Association acted in a fair and nondiscriminatory manner, we must give deference to the board's power to make reasonable business decisions. (*Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 270-271.)

First, the evidence showed that the Association has enforced the removal of encroachments against other homeowners.

Second, the Garretts' unstated assumption that the Association must treat all alleged encroachments equally is supported by neither authority nor common sense.

Here the trial court found:

"The Garretts argue that they were singled out unfairly in that other members of the Association have structures encroaching into the common area and that the board has taken no action against them. The court finds this contention

12.

unpersuasive.  The board investigated the complaints lodged by the Garretts against other homeowners.  The assertion that other encroachments exist remains speculative without surveying each involved property line.  The board could concluded [*sic*], in the exercise of reasonable business judgment, that the cost of those surveys was not warranted.  Each of the alleged encroaching conditions had existed for some time without complaint and that the existence or extent of each alleged encroachment was at best uncertain.  In contrast, the board had a reasonable basis, given the documents provided by Hermes, that the Garretts' pool equipment did encroach into the common areas and that the Garretts had constructed that encroachment notwithstanding Herme[s's] complaint and the board's notice to cease and desist."

The Garretts fail to cite to the trial court's findings, no less present a cogent argument why they are wrong.

IV

*Board's Duty to Inspect*

The Garretts contend that the Association violated the CC&R's.

Article V, section 6 of the CC&R's provides, in part:

"*Inspection of Work*.  Inspection of work and correction of defects therein shall proceed as follows:

"(a)  Upon the completion of any work for which approved plans are required under this Article, the Owner shall give written notice of completion to the Architectural Committee.

"(b)  Within sixty (60) days thereafter, the Architectural Committee or its duly authorized representative may inspect such Improvement.  If the Architectural Committee finds that such work was not done in substantial compliance with the approved plans it shall notify the Owner in writing of such

13.

noncompliance within such sixty (60) day period, specifying the particulars of noncompliance, and shall require the Owner to remedy the same.

"(c)  If upon the expiration of thirty (30) days from the date of such notification the Owner shall have failed to remedy such noncompliance, the Architectural Committee shall notify the Board in writing of such failure. . . .

"(d)  If for any reason the Architectural Committee fails to notify the Owner of any noncompliance within sixty (60) days after receipt of said written notice of completion from the Owner, the Improvement shall be deemed to be in accordance with said approved plans."

The Garretts point out that they gave notice of completion of their project on October 31, 2016.  The board declined to inspect the construction.  The Garretts argue that because they did not receive notice of noncompliance 60 days after the notice of completion, their work is deemed to conform to the improved plans.

The Association notified the Garretts in writing that their project did not conform to the approved plans on August 1, August 3, August 16, August 22, and October 3, 2016.  The Garretts were well aware of the Association's position that their project did not conform to the approved plans and they made it abundantly clear that they refused to comply.  The Association was not required to perform the useless act of providing even more notices.  Moreover, as the trial court found, any irregularity in the Association's procedure was the result of the Garretts' actions.

14.

V

*Damages*

The Garretts contend the trial court erred in awarding damages.

The Garretts removed the Association's fence at the back of their property. They replaced it with a fence that was lower than the original. The trial court awarded the Association $820 for the cost of restoring the fence to its original condition.

The trial court found that the Garretts' removal and replacement of the Association's fence were both a breach of the CC&R's and a tort. The Garretts argue that the court erred in "tortifying" a breach of contract. (Citing *Sands v. Walnut Gardens Condominium Assn., Inc.* (2019) 35 Cal.App.5th 174, 177.) But whether the Association's cause of action is characterized as a breach of contract or a tort is irrelevant. What is relevant is that the Garretts caused damage to the Association's fence and must compensate the Association.

The Garretts argue that the amount of damages is not supported by substantial evidence. They point to the testimony of the Association's expert that the $820 estimate to remove and replace the fence pertains to work that needs to be done to gain access to the pool equipment area. The Garretts argue that because they are enjoined to remove the pool equipment, the Association should not be awarded damages related to that purpose.

The flaw in the Garretts' argument is that they cite no authority requiring the Association to allow the Garretts to remove and replace the fence. The fence belongs to the Association. Given the Garretts' resistance to cooperating with the Association, the Association may well wish to have someone

else remove and replace the fence. The Association is entitled to damages for that purpose.

## VI

### *Restraining Order*

The Garretts contend the trial court erred in granting the restraining order against Brett Garrett.

Brett Garrett claims that he understandably reacted to being railroaded and unfairly treated by the board. He claims that his conduct neither unreasonably nor substantially interfered with other owners' enjoyment of their properties nor with the Association's governance.

But the trial court did not find that the Garretts were being railroaded or unfairly treated by the board. To the contrary, the court gave the Association most of the relief it requested.

As to substantial interference with other owners' enjoyment of their properties and the Association's governance, the trial court found:

"The evidence of Mr. Garrett's misbehavior was compelling. Commencing with the denial of his first architectural review application, Mr. Garrett engaged in a calculated campaign of intimidation of all whom he perceived to be obstacles to him getting what he wanted. His tirade was directed at neighbors Randy Hermes and Sue Wilson, board members Paul Abate and Drew Fountaine, and property manager Tami Chavin, among others. The conduct consisted of shouts, profanities, making loud or disturbing noises, staring into neighbors' yards or homes, and unsafe and threatening driving. His pattern of offensive and abusive conduct made individuals feel unsafe."

Nor is the restraining order impermissibly overbroad or vague. Words such as confronting, annoying, challenging, and

16.

provoking are ordinary English words understood by most adults. They are not vague and the order is as narrowly tailored as the circumstances call for.

## VII

### *Attorney Fees*

The Garretts contend that even if the trial court's order to remove the pool equipment is correct, we must reverse the award of attorney fees.

Section 5975, subdivision (c) provides, "In an action to enforce the governing documents [of a common interest development], the prevailing party shall be awarded reasonable attorney's fees and costs." An award of attorney fees is reviewed for an abuse of discretion. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.)

### *(a) Prevailing Party*

The Garretts point out that the Association did not prevail on the issue of whether they destabilized the slope and were awarded only $820 in damages. But the trial court found that the principal issue at trial was the pool equipment encroachment onto the common area. The Association prevailed on that issue and was awarded the amount of damages on which the parties agreed to repair the fence. By its action the Association regained control of the common area. The court did not abuse its discretion in determining the Association to be the prevailing party.

### *(b) Mediation*

The Garretts contend the Association is not entitled to attorney fees because it unreasonably refused to mediate prior to commencing litigation.

The Garretts rely on section 5960, part of the Davis-Stirling Act. That section provides: "In an enforcement action in which attorney's fees and costs may be awarded, the court, in determining the amount of the award, may consider whether a party's refusal to participate in alternative dispute resolution before commencement of the action was reasonable." (*Ibid.*)

The section provides that the trial court "may" consider a party's refusal to participate. (§ 5960.) It is not mandatory. Here the trial court did consider both parties' failure to participate. The court found that both parties offered to participate in mediation but could not agree on the terms, so no mediation occurred. The court stated that the circumstances do not require a denial or reduction in attorney fees. The court did not find the Association unreasonably refused to participate in alternative dispute resolution.

The Garretts' argument amounts to nothing more than that the Association was required to accept the free mediation service the Garretts proposed. The Garretts cite no authority requiring a party to accept any particular mediator.

### (c) Amount of Fee Award

The Garretts argue that the trial court erred in awarding the Association all its requested fees, rather than reducing them, because the Association did not prevail on all its claims.

The Association requested $323,574, and the trial court awarded $318,426.

The record shows the trial court carefully reviewed the Association's fee request and the Garretts' objections. The Garretts point out that the Association was awarded only $820 in damages and did not prevail on the issue whether they destabilized the slope.

18.

Damages were only a small part of the Association's case. The principal issue was the pool equipment encroachment onto the common area.

As to the issue of slope stability, the trial court found:

"It was undisputed at trial that the Garretts had added soil to their lot and, in doing so, changed the topography of the hillside. The Association presented competent expert testimony that this grading work had destabilized the hillside. Were this the case, then this condition would have created a substantial hazard to persons on the Garrett property and the common area below it and significantly diminished the value of the Association's interest in the common area. Although the court ultimately concluded that the Garretts' expert testimony, to the effect that the hillside had not been destabilized, was of greater persuasive force, it was not unreasonable for the Association to seek a judicial determination as to this important factual dispute."

The trial court stated, "Viewed as a whole, what the Association gained through the litigation was not out of line with the fees it incurred and now seeks reimbursement of."

The trial court did not abuse its discretion in awarding fees.

## DISPOSITION

The judgment is affirmed. Costs are awarded to respondent.

NOT TO BE PUBLISHED.

GILBERT, P. J.

We concur:

YEGAN, J.        PERREN, J.

19.

Mark S. Borrell, Judge

Superior Court County of Ventura

_____


Slaughter, Reagan & Cole, Barry J. Reagan and Gabriele M. Lashly for Defendants and Appellants.

Beaumont Tashjian, Jeffrey A. Beaumont, Tara Radley and Eugene Rubinstein for Plaintiff and Respondent.