[No. D008264. Fourth Dist., Div. One. Nov. 22, 1989.]

CITY OF OCEANSIDE et al., Plaintiffs and Respondents, v.
MICHAEL SHAWN McKENNA, Defendant and Appellant.

COUNSEL

Patrick E. Catalano, Robert E. Adams and Lynde Selden II for Defendant and Appellant.

Daley & Heft, Dennis W. Daley and Patricia A. Shaffer for Plaintiffs and Respondents.

OPINION

TODD, J.—Here, we consider whether the covenants, conditions and restrictions (CC&Rs) of a publicly subsidized condominium project validly can require owner occupancy and forbid the leasing of units. Michael Shawn McKenna appeals from a judgment against him on the City of Oceanside's (City) suit for injunctive and declaratory relief seeking to enforce such restrictions at the Sea Village condominium project, a part of the City's downtown redevelopment program.

FACTS

Sea Village is a condominium[1] project that was developed on property within the coastal zone as part of the City's residential waterfront housing

---

[1] Courts have recognized the unique problems of condominium living and the resulting need for more control over—and limitations upon—the rights of the individual owner than in more traditional forms of property ownership. " '[I]nherent in the condominium concept is the principle that to promote the health, happiness, and peace of mind of the majority of the unit owners since they are living in such close proximity and using facilities in common, each unit owner must give up a certain degree of freedom of choice which he might otherwise enjoy in separate, privately owned property.' " (*Laguna Royale Owners Assn.* v. *Darger* (1981) 119 Cal.App.3d 670, 681-682 [174 Cal.Rptr. 136], quoting *Hidden Harbour Estates, Inc.* v.

portion of the downtown redevelopment project. The redevelopment project included plans to demolish residential dwelling units occupied by persons of low and moderate income located within the coastal zone. The City's Community Development Commission (Commission) purchased the property upon which Sea Village was developed for $1,100,000 and sold it to Oceanside Beach Partners for $300,000. Oceanside Beach Partners was required to construct Sea Village as replacement dwellings pursuant to the City's housing plan and Government Code section 65590, which mandates replacement dwelling units for persons of low and moderate income be constructed within the coastal zone, if feasible. In addition to selling the property to Oceanside Beach Partners at below fair market value, the Commission made off-site improvements and relocated a business at a cost of approximately $350,000. In return for the sale at a reduced price, Oceanside Beach Partners agreed to CC&Rs that, among other things, bound itself and its successors in interest for 10 years and prohibited any Sea Village owner from (1) failing to occupy the dwelling as the owner's principal place of residence for any period and (2) renting or leasing the property at any time for any reason. The CC&Rs also include eligibility requirements for initial and subsequent purchasers of the units and provisions for prescreening of prospective purchasers by the Commission. The CC&Rs were designed to assure the continued affordability of the condominiums and to foster an owner-occupied environment in the redevelopment area. The grant deed authorizes the City and the Commission to enforce the CC&Rs.

McKenna purchased unit 24 of Sea Village in August 1985. In early 1987, McKenna obtained employment in San Francisco, which required moving to that city. He attempted to rent unit 24. In March 1987, the City learned that McKenna was attempting to rent unit 24. The City and the Commission filed this action for declaratory and injunctive relief on May 5, 1987. The City and the Commission obtained a temporary restraining order on May 5, 1987, and a preliminary injunction on May 28, 1987, enjoining McKenna from renting or leasing or offering for rent or lease unit 24 during the pendency of this action. On December 9, 1987, the City and the Commission filed a motion for summary judgment. On April 8, 1988, the trial court found there was no defense to the action and McKenna had presented no triable issue of fact. Judgment was entered in favor of the City and the Commission and an injunction was issued prohibiting McKenna from renting or leasing unit 24 and ordering McKenna to resume occupancy or commence sale of the unit within 30 days.

---

*Norman* (Fla.App. 1975) 309 So.2d 180, 181-182 [72 A.L.R.3d 305].) "Thus, it is essential to successful condominium living and the maintenance of the value of these increasingly significant property interests that the owners as a group have the authority to regulate reasonably the use and alienation of the condominiums." (*Laguna Royale, supra,* 119 Cal.App.3d at p. 682.)

DISCUSSION

I

■ McKenna contends summary judgment in favor of the City and the Commission was error because the reasonableness of the restriction is a triable issue of fact.[2] The contention lacks merit.

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) The issue of reasonableness is not a factual one, but rather a legal one. We note in *Ritchey* v. *Villa Nueva Condominium Assn.* (1978) 81 Cal.App.3d 688 [146 Cal.Rptr. 695, 100 A.L.R.3d 231], the Court of Appeal affirmed a summary judgment that upheld a duly adopted amendment to the condominium bylaws restricting occupancy to persons 18 years and older as a reasonable restriction on an owner's right to sell his unit to families with children.

McKenna has not presented competent evidence of a factual dispute on any material fact. Summary judgment was proper.

II

The grant deed provides: "(3) The Property is conveyed to Grantee at a purchase price herein called 'Purchase Price', determined in accordance with the uses permitted. Therefore, Grantee hereby covenants and agrees for itself, its successors, its assigns, and every successor in interest to the Property that the Grantee, such successors and such assigns, shall develop, maintain, and use the Property only as follows:

". . . . . . . . . . . . . . . . . . .

"(e) Grantee, or its successors and assigns, shall comply with the Covenants, Conditions, and Restrictions to Assure Affordable Housing attached hereto, labeled Exhibit 'B' and incorporated herein by this reference."

Exhibit "B" reads, in pertinent part as follows:

---

[2] Alternatively, McKenna contends the summary judgment was in error because, as a matter of law, the restraints were unreasonable. While we agree the issue of reasonableness is a legal issue, as discussed in part II of this opinion, we conclude the restraints were reasonable as a matter of law.

"Covenants, Conditions and Restrictions to
Assure Affordable Housing

". . . . . . . . . . . . . . . . . . .

"IV. Owner Occupancy

"A. *Occupancy by Owner Required; Lease or Rental Prohibited*

"In order to achieve a stabilized community of owner-occupied dwelling units, to avoid artificial inflation of prices caused by resales by speculators and to prevent scarcity caused by vacant homes awaiting resale by speculators, the conveyance made by this Grant Deed shall be conditioned upon and subject to the following covenants, conditions and restrictions:

". . . . . . . . . . . . . . . . . . .

"(3) Each Owner shall use and occupy the applicable dwelling as such Owner's principal place of residence immediately upon the close of escrow and shall continue to so use and occupy such Dwelling for the duration of ownership of the Dwelling. The Owner of each Dwelling on the property shall not lease or rent the Dwelling at any time for any reason.

". . . . . . . . . . . . . . . . . . .

"IX. General Provisions

". . . . . . . . . . . . . . . . . . .

"B. *Irrevocability; Term of Exhibit B*

"This Exhibit B and the covenants, conditions and restrictions created hereby shall be irrevocable by the Grantee, its successors and assigns to the Property or any portion thereof, or any subsequent Owner of each Dwelling. The provisions of this Exhibit B shall continue in effect with respect to each Dwelling for a period ending ten (10) years after issuance of a Certificate of Completion by the Grantor for construction of the applicable Dwelling."

The grant deed also provides: "(8) All conditions, covenants and restrictions contained in this Grant Deed shall be covenants running with the land, and shall, in any event, and without regard to technical classification or designation, legal or otherwise, be, to the fullest extent permitted by law and equity, binding for the benefit and in favor of, and enforceable by

Grantor, its successors and assigns, and the City of Oceanside and its successors . . . .

"........................

"(10) In amplification and not in restriction of the provisions set forth hereinabove, it is intended and agreed that Grantor shall be deemed a beneficiary of the agreements and covenants provided hereinabove both for and in its own right and also for the purposes of protecting the interests of the community. All covenants without regard to technical classification or designation shall be binding for the benefit of the Grantor, and such covenants shall run in favor of the Grantor for the entire period during which such covenants shall be in force and effect, without regard to whether the Grantor is or remains an owner of any land or interest therein to which such covenants relate. Grantor shall have the right, in the event of any breach of any such agreement or covenant, to exercise all the rights and remedies, and to maintain any actions at law or suit in equity or other proper proceedings to enforce the curing of such breach of agreement or covenant.

"........................

"(13) The covenants contained in the Grant Deed shall be construed as covenants running with the land and not as conditions which might result in forfeiture of title . . . ."

Here, the CC&Rs are covenants running with the land. The Legislature has recognized that "covenants and restrictions in the [document creating a condominium project] shall be enforceable equitable servitudes, unless unreasonable . . . ." (Civ. Code, § 1354.)

Thus, the determinative issue in this case is whether the restrictions are reasonable. For all the reasons stated below, we find the restrictions are reasonable.

Relying on Civil Code section 711,[3] McKenna attacks them as unreasonable restrictions on alienation.[4] Actually, the CC&Rs here involve a

---

[3] Civil Code section 711 provides: "Conditions restraining alienation, when repugnant to the interest created, are void."

[4] The traditional rule against restraints on alienation is based on the public policy notion that the free alienability of property fosters economic and commercial development. (Rest., Property (1944) pp. 2129-2133, 2379-2380.) However, almost from the inception of the rule, competing policy considerations have led to exceptions to the rule, with the validity of the restraint determined on the basis of the duration, type of alienation precluded or the size of the

restriction on use as well as a restriction on alienation. We find instructive guidance in the cases dealing with restrictions on alienation since they set forth criteria for determinating reasonableness.

■ Reasonable restrictions on alienation have been held consistent with Civil Code section 711. " 'The day has long since passed when the rule in California was that all restraints on alienation were unlawful under the statute; it is now the settled law in this jurisdiction that only unreasonable restraints on alienation are invalid.' [Citation.]" (*Martin* v. *Villa Roma, Inc.* (1982) 131 Cal.App.3d 632, 635 [182 Cal.Rptr. 382].)

In determining whether a restraint on alienation is unreasonable, the court must balance the justification for the restriction against the quantum of the restraint. The greater the restraint, the stronger the justification must be to support it. (*Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943, 948 [148 Cal.Rptr. 379, 582 P.2d 970].)

■ Here, the justification offered by the City and the Commission is the restrictions will foster the City's and the Commission's redevelopment goals of providing a stabilized community of owner-occupied units for low and moderate income persons. The CC&Rs for Sea Village specifically state the restrictions are intended to achieve such a stabilized community and "to avoid artificial inflation of prices caused by resales by speculators and to prevent scarcity caused by vacant homes awaiting resale by speculators . . . ." The City's subsidy of the Sea Village project was intended to provide affordable housing in the area for low and moderate income persons for at least 10 years.

We can take judicial notice that over the past two decades, at the very least, real estate prices in California have been rising rapidly and the market has attracted a wide range of investments. (Evid. Code, § 451, subd. (f).) Thus, the disputed restrictions clearly and directly are related to the stated purposes of maintaining a stabilized community of low and moderate income residents and discouraging speculation by real estate investors.

Certainly, the provision of housing for low and moderate income persons is in keeping with the public policy of this state. As this court observed in

---

class precluded from taking. (4A Thompson, Real Property (1961) § 2016.) The modern view is to test the validity of the restraints by weighing the competing social policies. (*Gale* v. *York Center Community Cooperative, Inc.* (1960) 21 Ill.2d 86 [171 N.E.2d 30].) In *Gale, supra,* the Illinois Supreme Court observed: "[T]he crucial inquiry should be directed at the utility of the restraint as compared with the injurious consequences that will flow from its enforcement. If accepted social and economic considerations dictate that a partial restraint is reasonably necessary for their fulfillment, such a restraint should be sustained." (*Id.* at p. 33.)

*Buena Vista Gardens Apartments Assn.* v. *City of San Diego Planning Dept.* (1985) 175 Cal.App.3d 289, 295 [220 Cal.Rptr. 732]: "In enacting Government Code, article 10.6 (§§ 65580-65589.8), detailing requirements for the mandatory housing element [of a city's or county's general plan], the Legislature declared the availability of housing is a matter of 'vital statewide importance' and 'the early attainment of decent housing and a suitable living environment for every California family is a priority of the highest order.' (§ 65580, subd. (a).) To attain the state housing goal, the Legislature found, requires 'cooperative participation' between government and the private sector (§ 65580, subd. (b)), cooperation among all levels of government (§ 65580, subd. (c)), and use of state and local governmental power 'to facilitate the improvement and development of housing' for 'all economic segments of the community' (§ 65580, subd. (d))." Thus, the restrictions support rather than offend the policies of this state. Given this factor and the fact they clearly and directly are related to the legitimate purposes for which the Sea Village condominium project was established, we find as a matter of law they are reasonable.[5]

In *Martin* v. *Villa Roma, Inc., supra,* 131 Cal.App.3d 632, the court used a similar analysis to uphold restrictions designed to maintain affordable housing. The restrictions involved corporation bylaws that provided in essence that units could be sold only to persons meeting certain eligibility requirements and the sales price could not exceed an amount set by formula.

The CC&Rs here are also authorized by law. Health and Safety Code section 33437, in pertinent part, provides that a redevelopment agency "may obligate lessees or purchasers of property acquired in a redevelopment project to: [¶] (a) Use the property for the purpose designated in the redevelopment plans."

McKenna's reliance on *Laguna Royale Owners Assn.* v. *Darger, supra,* 119 Cal.App.3d 670 is misplaced. *Laguna Royale* involved a private condominium project—not subsidized housing. Moreover, even under the test articulated in *Laguna Royale* the restrictions here would be reasonable. In *Laguna Royale* the court upheld the right of a private condominium homeowners' association to impose reasonable restraints on transfer without approval but concluded the approval was unreasonably withheld. The

---

[5] We note the restrictions are for 10 years, even though state law would authorize a longer period of time. Health and Safety Code section 33334.2, for example, which requires the use of certain tax money for increasing and improving the community's affordable housing stock, provides that the redevelopment agency shall require that low income dwelling units developed pursuant to that provision remain affordable for at least 30 years. (Health & Saf. Code, § 33334.2, subd. (1)(3).)

*Laguna Royale* court set forth these criteria for testing the reasonableness of restrictions: "(1) whether the reason for [the restriction] is rationally related to the protection, preservation or proper operation of the property and the purposes of the Association as set forth in its governing instruments and (2) whether the power was exercised in a fair and nondiscriminatory manner. [Citations.] Another consideration might be the nature and severity of the consequences of application of the restriction (e.g., transfer declared void, estate forfeited, action for damages). [Citations.]" (*Id.* at pp. 683-684.)

Here, the City and the Commission subsidized the construction of Sea Village at a cost of more than $1 million in public funds to provide affordable housing to low and moderate income persons and to foster an owner-occupied community in the redevelopment area. The restriction on leasing and the requirement imposed on owners to occupy their units are rationally related to the purposes set forth in the CC&Rs. McKenna has not offered any competent evidence the restrictions were applied in an unfair or discriminatory manner. Finally, the consequences to McKenna do not amount to a forfeiture of his property. The injunction orders him to resume occupancy of the unit within 30 days or put the property up for sale. At the very least, McKenna had constructive notice of the restriction on leasing and the requirement of owner occupancy. He chose at the time of purchase to sign an agreement with these restrictions. If circumstances precluded his occupying the unit, he could sell it. The CC&Rs provide a method for determining prices for resales that takes into account the amount that the owner paid for the unit as well as the improvements made to the unit and a cost of living formula.

With respect to *Laguna Royale, supra,* 119 Cal.App.3d 670, we also note the court adopted a rule that condominium owners as a group have the authority to *reasonably* regulate the use and alienation of the condominiums: "[I]t is essential to successful condominium living and the maintenance of the value of these increasingly significant property interests that the owners as a group have the authority to regulate *reasonably* the use and alienation of the condominiums. [¶] Happily there is no impediment to our adoption of such a rule; indeed, the existing law suggests such a rule." (*Id.* at p. 682, italics added.)

McKenna's reliance on *Bernardo Villas Management Corp.* v. *Black* (1987) 190 Cal.App.3d 153 [235 Cal.Rptr. 509] also is misplaced. In *Bernardo Villas Management Corp.,* which also involved a private condominium project rather than subsidized housing, we upheld the trial court's finding that a restriction against parking trucks in carports as applied to a new, clean, noncommercial pickup truck was unreasonable and unenforceable. The facts of that case and this case are not at all similar.

The recurring point in this line of cases is that the enforceability of the restriction depends on whether the restriction is reasonable. Whether a restriction is reasonable will depend upon the particular circumstances of the case. (See *Ritchey* v. *Villa Nueva Condominium Assn., supra,* 81 Cal.App.3d 688, 694, dealing with former Civ. Code, § 1355, subd. (c), which provided reasonable amendments to restrictions relating to a condominium project are binding upon every owner and every condominium in the project.)

McKenna also attacks the restriction prohibiting leasing as unreasonable on its face because it does not contain uniform, objective standards for its enforcement. He relies on (1) title 10 of the California Code of Regulations, section 2792.25, subdivision (a), which provides: "[A]ny provision which purports to restrict or abridge whether directly or indirectly, the right of an owner to sell or lease his subdivision interest must include uniform, objective standards for invoking a restriction upon sale or lease, none of which shall be based upon the race, color, religion, sex, marital status, national origin or ancestry of the vendee or lessee" and (2) the fact the City allows rent-paying roommates.

With respect to the rent-paying roommate assertion, to put the issue in proper context, the City allows rent-paying roommates "[s]o long as the owner of the unit continues to occupy the unit as his/her principal place of residence . . . ." According to the City's interpretation, the CC&Rs do not "prohibit people living at Sea Village from having rent paying room-mates." We fail to see how allowing owners who occupy their units to have rent-paying roommates defeats or compromises the purposes underlying the restrictions in the CC&Rs. To the contrary, in individual cases where unexpected expenditures arise, it may become necessary for low and moderate income owners to have rent-paying roommates in order to meet their mortgage payments. The goal of fostering owner-occupancy is not threatened by allowing roommates if the owner continues to reside in the unit.

As to enforcement procedure, the City's chief of housing testified in a deposition that the City's housing division follows a standard procedure where there is an alleged violation. First, the division attempts to contact the alleged violator. If the division is unable to confirm the alleged violator is occupying his or her unit, the matter is referred to the City Attorney. The City receives complaints from individual residents, the association's board of directors and the management company. There has been no showing by competent evidence of anything arbitrary about the City's method of enforcement. Therefore, we conclude that even though there are no written standards for enforcement of the prohibition on leasing, it is being enforced in a uniform and objective manner and not on the basis of race, creed, color,

national origin or sex. Neither the lack of written standards nor the allowance of rent-paying roommates in owner-occupied units renders the lease restriction here violative of California Code of Regulations, section 2792.25, subdivision (a).

## III

■ McKenna contends the restrictions should not be enforced because they are inconsistent with a statement in the condominium final subdivision public report or "white paper."[6] We disagree.

At page 4, paragraph 12, the Sea Village "white paper" reads: "The subdivider of this project has indicated that he intends to sell all of the units in this project; however, any owner, including the subdivider, has a legal right to lease the units. Prospective purchasers should consider possible effects on the development if a substantial portion of the units become rental properties."

In asking us to find the restrictions unenforceable because they are inconsistent with the "white paper," McKenna relies on Business and Professions Code section 11019. However, this section empowers the state real estate commissioner to order a subdivider to discontinue his or her activities when he or she "(3) Has failed to fulfill representations or assurances with respect to the subdivision or the subdivision offering upon which the department relied in issuing a subdivision public report." (Bus. & Prof. Code, § 11019, subd. (a)(3).) The section does not address remedies at law.

Nor has McKenna referred us to any provision in Business and Professions Code 11018 et seq. that indicates restrictions inconsistent with the "white paper" are to be set aside.[7] Rather, Business and Professions Code section 11018.5, subdivision (c),[8] provides for the binding effect of the CC&Rs.

---

[6] Business and Professions Code section 11010 provides that any person who intends to offer subdivided lands (including a condominium project) for sale or lease shall file with the Department of Real Estate an application for a public report containing certain specified information about the project. Business and Professions Code section 11018 provides that unless there are grounds for denial, the state real estate commissioner, after examining the subdivision, shall issue the subdivider a public report authorizing the sale or lease of the lots and parcel in the subdivision. Business and Professions Code section 11018 also provides "[t]he report shall contain the data obtained in accordance with Section 11010 and which the commissioner determines are necessary to implement the purposes of this article."

[7] However, we note under Business and Professions Code sections 11023 and 11029.1 certain violations of the provisions governing the "white paper" are punishable by fines, imprisonment and civil penalties.

[8] Subdivision (c) of Business and Professions Code section 11018.5 reads: "After transfer of title to the first lot, apartment or condominium in the subdivision to any purchaser, the

Moreover, it is significant that here there was compliance with Business and Professions Code section 11018.1, which provides that the prospective purchaser shall be given a copy of the public report along with a copy of a statement entitled "COMMON INTEREST DEVELOPMENT GENERAL INFORMATION" that includes, among other things, the following information: "Your ownership in this development and your rights and remedies as a member of its association will be controlled by governing instruments which generally include a Declaration of Restrictions (also known as CC & R's), Articles of Incorporation (or association) and bylaws. The provisions of these documents are intended to be, and in most cases are, enforceable in a court of law. Study these documents carefully before entering into a contract to purchase a subdivision interest." (Bus. & Prof. Code, § 11018.1, subd. (c).) Here, the statement referring the purchaser to the CC&Rs was included on page two of the Sea Village "white paper." Further, the "white paper," on page six, also refers purchasers to restrictions.

For the first time on appeal, McKenna contends since this paragraph in the "white paper" concerning leasing is inaccurate and misleading, a triable issue of fact exists as to whether he relied on this statement in the "white paper." McKenna did not claim reliance below nor did he present any evidence to the trial court that he relied on the "white paper." ■ "[P]ossible theories not fully developed or factually presented to the trial court cannot create 'a triable issue' [of fact] on appeal [from a summary judgment]." (*Johanson Transportation Service* v. *Rich Pik'd Rite, Inc.* (1985) 164 Cal.App.3d 583, 588 [210 Cal.Rptr. 433].)

IV

■ McKenna contends the restrictions should be void because they abridge his constitutional right to travel. The contention is without merit.

He relies on two United States Supreme Court cases which recognized a constitutional right to travel: *Kent* v. *Dulles* (1958) 357 U.S. 116 [2 L.Ed.2d 1204, 78 S.Ct. 1113], in which the court ruled the denial of a U.S. passport could not be based on the refusal to take an oath denying Communist Party

provisions of the declaration of restrictions, articles of incorporation, bylaws, management contracts (and the provisions of any and all other documents establishing, in whole or in part, the plan for use, enjoyment, maintenance, and preservation of the subdivision) as last submitted to the commissioner prior to issuance of the final public report, shall be binding upon the purchaser and occupant of every other lot, apartment, or condominium in the subdivision, including, except with regard to a limited-equity housing cooperative or a time-share project, purchasers acquiring title by foreclosure, whether judicial or nonjudicial, or by deed in lieu thereof, under any mortgage or deed of trust, whether or not the mortgage or deed of trust was recorded prior to recordation of the covenants, conditions and restrictions applicable to the first lot, apartment, or condominium."

membership; and *Attorney General of N.Y.* v. *Soto-Lopez* (1986) 476 U.S. 898 [90 L.Ed.2d 899, 106 S.Ct. 2317], in which a plurality of the court said the right to travel was implicated by a preference in civil service employment opportunities offered to New York resident veterans only if they lived in the state when they entered military service.

*Kent* v. *Dulles, supra,* 357 U.S. 116, is so obviously distinguishable it needs no further discussion. Significantly, the plurality in *Soto-Lopez, supra,* 476 U.S. 898, distinguished between bona fide residence requirements, which do not burden the constitutional right to travel and residence requirements "such as durational, fixed date, and fixed point residence requirements, which treat established residents differently based on the time they migrated into the State." (*Id.* at p. 903, fn. 3 [90 L.Ed.2d at p. 906].) The plurality said the unconstitutionality of the latter stems from the fact they create fixed, permanent distinctions upon which deprivations of significant benefits are based, thus penalizing persons for exercising their rights to migrate. (*Id.* at p. 909 [90 L.Ed.2d at p. 909].)

In *McCarthy* v. *Philadelphia Civil Serv. Comm.* (1976) 424 U.S. 645 [47 L.Ed.2d 366, 96 S.Ct. 1154], a per curiam opinion, the United States Supreme Court upheld a city residency requirement for municipal employees, finding it was a bona fide residence requirement rather than the type criticized by the plurality in *Soto-Lopez, supra,* 476 U.S. 898. The court in *McCarthy* said: "In this case appellant claims a constitutional right to be employed by the city of Philadelphia *while* he is living elsewhere. There is no support in our cases for such a claim. (*Id.* at pp. 646-647 [47 L.Ed.2d at pp. 368-369], fn. omitted, original italics.)

Here, as in *McCarthy, supra,* 424 U.S. 645, the restrictions do not create impermissible infringements on the right to travel. McKenna cannot base his claim that he has the right to retain ownership in the Sea Village unit while living in San Francisco on his constitutional right to travel.

## DISPOSITION

Affirmed.

Work, Acting P. J., and Huffman, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 14, 1990.