Filed 3/10/26  City of Santa Monica v. Sung CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| CITY OF SANTA MONICA,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>CHIANG JUEI SUNG,<br><br>　　　Defendant and Appellant. | B336881, B338716<br>(Los Angeles County<br>　Super. Ct. Nos. SC129850) |

APPEAL from a judgment and postjudgment order of the Superior Court of Los Angeles County, H. Jay Ford III, Judge. Affirmed.

Law Office of Thomas A. Nitti and Thomas A. Nitti for Defendant and Appellant.

Paul Resnikoff as Amicus Curiae on behalf of Defendant and Appellant.

Douglas Sloan, City Attorney, Romy Ganschow, Chief Deputy City Attorney, and Jonathan Frank, Deputy City Attorney, for Plaintiff and Respondent.

Months after purchasing a first-floor apartment unit in the Dorchester condominium building in the City of Santa Monica (City), Chiang Juei Sung filed an unlawful detainer action to remove a low-income tenant who had been living in the unit for eight years. The City commenced this declaratory relief action to enforce a Deed Restriction requiring the owner to rent the unit to low-income tenants. The Deed Restriction was recorded against the Dorchester property in 1988 by its developer in accordance with a Development Agreement with the City and related development agreement laws (Gov. Code, § 65864 et seq.).[1]

At a bifurcated bench trial, the lower court interpreted the Development Agreement, a City Ordinance formally approving the agreement, and the Deed Restriction. Consistent with these instruments, the court entered judgment upholding the low-income rental use restrictions against Sung's apartment and awarded the City $144,210 in contractual attorney fees.

Sung challenges the judgment and postjudgment attorney fee award in this consolidated appeal. Her appellate contentions interpret the Ordinance to the exclusion of the Development Agreement and Deed Restriction. This approach fails to reconcile the purposes and effects of each. We affirm the judgment and postjudgment attorney fee award.

## BACKGROUND

### A.    The Development Agreement and Its Approval

Harris Toibb owned two rent-controlled apartment buildings in the City. Consistent with development agreement laws (Gov. Code, § 65864 et seq., as enacted by Stats. 1979,

---

[1]    Subsequent unspecified references to statutes are to the Government Code.

ch. 934, § 1), in February 1982 Toibb and the City executed a Housing Incentive and Development Agreement (Development Agreement) governing the development of his properties. The agreement referred to Toibb's properties as the 4th and 6th Street Properties. (See Dev. Agreement Recitals, §§ A–B; Dev. Agreement, §§ 1, 5.)[2] The 4th Street Property development, completed in 1993, became the Dorchester condominium building.

Among various terms and conditions, the Development Agreement authorized the demolition of existing structures on the 4th Street Property and construction of a "new four-story, 42-unit condominium building, of which fifteen (15) [first-floor units] will be apartment units having rents set to be affordable to low- and moderate-income households." (Dev. Agreement Recitals, § D; Dev. Agreement, §§ 2(D)(4)(a)–(f).) Eight units (two two-bedroom units and six one-bedroom units) were to be rented by low-income households; seven units (two two-bedroom units and five one-bedroom units) were to be rented to moderate-income households. These units "shall be provided as affordable rental units for forty (40) years or the life of the 4th

---

[2] The development agreement laws envision contractual agreements that freeze local rules, regulations, specifications, and policies governing land use and construction. (See § 65866; *North Murrieta Community, LLC v. City of Murrieta* (2020) 50 Cal.App.5th 31, 41.) Agreements made under these laws must specify their duration, permitted uses of property, density or intensity of uses, and reservation or dedication of land for public purposes. (§ 65865.2.) Such agreements may include conditions, terms, restrictions, and requirements for subsequent discretionary actions, provided they do not prevent development for uses set forth in the agreements. (*Ibid.*)

3

Street Project, whichever is greater." (Dev. Agreement, §§ 2(D)(4)(a)–(f), some capitalization omitted.)[3]

To effectuate these terms, the Development Agreement required Toibb to record a Declaration of Restrictions (Deed Restriction) in the chain of title of the 4th Street Property containing the rental and affordability restrictions before construction. (Dev. Agreement, § 2(D)(5).) In exchange, the Development Agreement provided Toibb various regulatory concessions and development incentives. (See Dev. Agreement Recitals, §§ G–H; Dev. Agreement, §§ 3–4.)

The Development Agreement also contained attorney fee, assignment, and duration provisions. It authorized prevailing party attorney fees to Toibb or any successor in interest for litigation or proceedings to enforce the agreement. (Dev. Agreement, § 10.) Upon any transfer or assignment of interest(s) in the 4th Street Project, all benefits and burdens would be transferred to all successors in interest or assignees. (*Id.*, §§ 13(B)–(C).) The latter provision provided that the "Agreement shall expire forty (40) years from the date of Council approval." (*Id.*, § 14, some capitalization omitted.)

On February 23, 1982, the City Council formally approved the Development Agreement by passing Ordinance No. 1247 (Ordinance).[4] The Ordinance codified the terms and conditions of the Development Agreement. (Ordinance §§ 1–2.)

---

[3]     The 4th Street Project is defined as the "improvement of the 4th Street Property" provided in Toibb's development plan. (Dev. Agreement Recitals, § D, some capitalization omitted.)

[4]     "A development agreement is a legislative act that shall be approved by ordinance and is subject to referendum." (§ 65867.5, subd. (a).) Once recorded with the county recorder, a development agreement imparts notice to all persons "as is afforded by the recording

## B. The Deed Restriction, Marketing Materials, and Rent Sheet

"[I]n accordance with the terms of the Development Agreement," Toibb recorded an August 1988 Agreement Imposing Restrictions on Real Property (Deed Restriction) on the 4th Street Property.  In addition to other restrictions, the Deed Restriction required all 15 first-floor units "be provided as affordable rental units for forty (40) years or the life of the project, whichever is greater."  (Deed Restriction, §§ 2, 4(a)–(f).)  The Deed Restriction further prohibited unit owners from renting their units to family members.  (*Id.*, § 5.)  These restrictions are to "run with the land and shall be binding upon Owner and [their] assigns, transferees and successors until terminated as provided herein."  (*Id.*, § 6.)  For any controversy or dispute arising out of or relating to the Deed Restriction, "the prevailing party shall be entitled to recover from the losing party reasonable expenses, attorneys' fees and costs."  (*Id.*, § 8.)

Initial marketing materials for the Dorchester (1992–1993) listed all 15 first-floor units as either low- or moderate-income rental units.  These materials, subsequent marketing materials (2015; 2017), and a separate "Rent Sheet" (some capitalization omitted) list Unit 104 as a low-income rental.

## C. Sung's Purchase and Unlawful Detainer Action

In May 2018, Sung purchased Unit 104 in the Dorchester, a first-floor, two-bedroom, two-bathroom apartment unit.  Before the close of escrow, Sung received notice of the Development

---

laws of this state.  The burdens of the agreement shall be binding upon, and the benefits of the agreement shall inure to, all successors in interest to the parties to the agreement."  (§ 65868.5.)

Agreement, Ordinance, and Deed Restriction through the escrow file. Her daughter, acting as Sung's agent, also received copies of these instruments prior to the close of escrow. The Deed Restriction is also listed on a March 2018 preliminary title report. At the time of Sung's purchase, a disabled, low-income tenant was renting Unit 104 for approximately $1,200 and had occupied the unit since 2009. A copy of the tenant's lease was furnished to Sung's daughter before close of escrow.

In July 2018, Sung served the tenant with an owner-occupancy eviction notice. Three days later, the City notified Sung owner occupancy was expressly prohibited under the Development Agreement and Deed Restriction. Despite receiving this notice and meeting with counsel for the City and tenant, Sung commenced an unlawful detainer action.

## D.    Underlying Proceedings

On September 17, 2018, the City filed the operative complaint seeking a judicial declaration prohibiting Sung "from providing Unit 104 to ineligible tenants or to the owner herself," as well as prevailing party attorney fees under the Deed Restriction. In the first phase of a bifurcated bench trial, the court found the Development Agreement and Deed Restriction prohibited Sung from owner occupancy.

Prior to the second-phase trial on use restriction duration, Sung and the tenant settled the eviction action. The settlement barred Sung from evicting the tenant for owner occupancy and other no-fault matters with a reservation of rights under the Development Agreement. Sung argued this settlement rendered the remaining issue in her second-phase trial non-justiciable.

6

Following the second-phase trial, the court rejected Sung's non-justiciability argument and entered declaratory judgment for the City.  In determining use restriction duration, the court found two provisions in the Development Agreement potentially in conflict.  (Compare Dev. Agreement, § 2(D)(4)(f) [requiring use restrictions for 40 "years or the life of the 4th Street Project, whichever is greater" (some capitalization omitted)] with *id.*, § 14 [the agreement "shall expire forty (40) years from the date of Council approval" (some capitalization omitted)].)  After addressing the policies and purposes of each provision, the court found the latter dictated the termination date of the underlying Development Agreement, while the former ascribed use restriction duration on the property that "would outlast the 40-year term" of the underlying agreement.  The judgment declared the rental and low-income use restrictions applied to Sung's apartment and endured "through the end of the useful life" of the Dorchester.

Following entry of judgment, the City moved for $144,210 in attorney fees under the Deed Restriction, seeking fees for 262.2 hours of work at $550 per hour for its lead attorney.  Following additional briefing by the parties and a hearing, the court granted the City's motion.

## DISCUSSION
### A. Nature and Effect of the Development Agreement, Ordinance, and Deed Restriction

Sung raises various contentions challenging the declaratory judgment and attorney fee award.  Her contentions presume the Ordinance governs every issue raised in this appeal.  From this presumption, Sung argues the Ordinance is unconstitutionally

7

ambiguous, to be strictly construed, unamenable, and inextensible. In similar fashion, Sung argues the Ordinance did not authorize the award of contractual attorney fees. Sung's presumption misapprehends the nature and purposes of each instrument.

As its name suggests, the Development Agreement constitutes a contract between the City and Toibb concerning the Dorchester development. (See §§ 65865, subd. (a), 65866; see also Dev. Agreement Recitals § D.) The City provided Toibb development bonuses and incentives (see Dev. Agreement, §§ 3(A)–(J), 4(A)–(H)) and in exchange, Toibb agreed to dedicate all 15 first-floor units as low- or moderate-income rentals (see *id.*, §§ 2(D)(4)(a)–(f), 2(D)(5)). These terms constitute bargained for obligations between contracting parties. (See Civ. Code, §§ 1605–1606; *Neighbors in Support of Appropriate Land Use v. County of Tuolumne* (2007) 157 Cal.App.4th 997, 1015 [use restrictions imposed "as part of a bargained exchanged" in development agreement]; *City of Oceanside v. McKenna* (1989) 215 Cal.App.3d 1420, 1422–1423, 1429–1430 (*McKenna*) [same].)

The Ordinance did not transmutate the Development Agreement into something other than a contract. The development agreement laws require local legislative bodies, in which "the Legislature intended to exclusively delegate the approval of development agreements," to formally approve development agreements by ordinance. (§ 65867.5, subd. (a); *Center for Community Action & Environmental Justice v. City of Moreno Valley* (2018) 26 Cal.App.5th 689, 703.) "While, as a legislative act, a development agreement can be disapproved by referendum, an unchallenged development agreement is an enforceable contract between the municipality and the

8

developer." (*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 442; see *M.F. Kemper Construction Co. v. City of Los Angeles* (1951) 37 Cal.2d 696, 704 [no "special rules of law [apply] because a governmental body is a party to a contract"].)[5]

The Deed Restriction constituted Toibb's partial performance under the agreement with the City. When recorded (and before any sale in the chain of title), the Deed Restriction created the use restrictions and rendered them enforceable as equitable servitudes against Toibb and successors in interest. (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 375, 379 (*Nahrstedt*); see *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 238.) As expressly envisioned, these restrictions are to "run with the land." (Deed Restriction, § 6.)

In short, the Development Agreement, Ordinance, and the Deed Restriction constitute discrete legal instruments. One is a contract; the other a legislative approval; and the third imposes equitable servitudes on land.

## B. The Deed Restriction Clearly Established the Use Restrictions

The City's declaratory relief action seeks to resolve a "question of construction" arising under the Deed Restriction. (Code Civ. Proc., § 1060.) As this instrument imposed

---

[5]     Sung recognizes legislative action can create contractual rights. (See *Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1187 [where "the legislation is itself the ratification or approval of a contract, the intent to make a contract is clearly shown"].)

restrictions on a particular use of land, we apply contract principles "under which courts try 'to effectuate the legitimate desires of the covenanting parties.' [Citation.] When landowners express the intention to limit land use, 'that intention should be carried out.' [Citations.]" (*Nahrstedt, supra,* 8 Cal.4th at pp. 380–381.) Without any conflicting extrinsic evidence offered by the parties in this case, we employ an independent standard of review. (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 390.)

Unless modified, terminated, or extended, equitable servitudes legally terminate at the expiration of the period set forth in the recorded instrument creating them. (See, e.g., *Southern California School of Theology v. Claremont Graduate University* (2021) 60 Cal.App.5th 1, 7–8; *Costa Serena Owners Coalition v. Costa Serena Architectural Com.* (2009) 175 Cal.App.4th 1175, 1200–1201; *Diederichsen v. Sutch* (1941) 47 Cal.App.2d 646, 648–649.) Here, that instrument is the Deed Restriction. Without any evidence of modification, termination, or extension, its terms dictate how the use restrictions endure and when they terminate.

The Deed Restriction explicitly states the rental and affordability use restrictions are to endure for "forty (40) years or the life of the project, whichever is greater." (Deed Restriction, § 4(f).) The "project" is defined as the improvements to the 4th Street Property in Toibb's development plan approved in the Development Agreement. Those improvements, including Sung's apartment unit, are embodied by the Dorchester. Absent other provisions in the Deed Restriction delimiting use restriction duration or termination, we conclude this plain language created

10

use restrictions that endure for the greater of 40 years or the life of the Dorchester.

Sung's interpretive arguments do not acknowledge any provision in the Deed Restriction and instead rely on the 40-year expiration provision in the Development Agreement. From this provision in the underlying contract, Sung argues the use restrictions expired on February 23, 2022, "forty (40) years from the date" the City Council approved the Development Agreement. (Dev. Agreement, § 14.)

We decline to impose a provision governing the underlying contract on the deed Toibb recorded to create restrictive servitudes. To the extent Sung suggests the use restrictions expire whenever the underlying agreement requiring them expires, she provides no authority in support. The development agreement laws envision these types of executory obligations. (See § 65865.2; *Santa Margarita Area Residents Together v. San Luis Obispo County Bd. of Supervisors* (2000) 84 Cal.App.4th 221, 228; see also Civ. Code, § 1609.) Sung gives us reason to question the ability of a developer, as party to a development agreement, to record equitable servitudes that run with the land for the useful life of the property developed in accordance with the agreement.

Anticipating our conclusion, Sung contends the underlying affordability restrictions are incurably uncertain because they fail to specify rent prohibitions on a "unit-by-unit basis." It is true ""restrictive covenants are construed strictly against the person seeking to enforce them, and any doubt will be resolved in favor of the free use of land. But it is also true that the "'intent of the parties and the object of the deed or restriction should govern, giving the instrument a just and fair interpretation.'"""

11

[Citation.]" (*Chee v. Amanda Goldt Property Management* (2006) 143 Cal.App.4th 1360, 1377.) Construing ambiguity against the drafter "applies only when other canons of construction, including consideration of extrinsic evidence of the parties' intent, fail to resolve the ambiguity." (*Vine v. Bear Valley Ski Co.* (2004) 118 Cal.App.4th 577, 590, fn. 2.)

"Under the circumstances of creation, and in practice" (*Starlight Ridge South Homeowners Assn. v. Hunter-Bloor* (2009) 177 Cal.App.4th 440, 452), we conclude Sung's apartment is low-income restricted. The undisputed parol evidence—the listing index, rental sheet, marketing materials, and documents and messages communicated during Sung's purchase—all point to this specific restriction.[6] (See *VFLA Eventco, LLC v. Williams Morris Endeavor Entertainment, LLC* (2024) 100 Cal.App.5th 287, 301 [subsequent conduct considered].)

This interpretation is also consistent with the stated purpose of the Development Agreement—that "at least 25% of the total units" of the Dorchester be "affordable to households of low- or moderate-income." (Dev. Agreement Recitals, § G; see *id.* § H [agreement constitutes "effort to expand housing

---

[6] We granted permission for amicus curiae Paul Resnikoff, another owner of a first-floor Dorchester apartment unit, to file a brief supporting Sung. Resnikoff contends this action will unfairly bind non-party owners of first-floor Dorchester apartments. He also notes the City has engaged in inconsistent and conflicting enforcement efforts for the same use restrictions against other apartments.

We decline to fully address these arguments (see *Washoe Meadows Community v. Department of Parks & Recreation* (2017) 17 Cal.App.5th 277, 291, fn. 6), but note this appeal reviews the declaratory judgment against Sung's apartment. The judgment does not determine whether and to what extent these or other use restrictions are to apply elsewhere.

opportunities and accommodate the housing needs of all economic levels, and to assist in the development of adequate housing to meet the needs of low- and moderate-income households by way of 'provision of regulatory concessions and incentives'"].) Removing the affordable rental restrictions from Sung's apartment would thwart these purposes and the intention of the parties who agreed to them. (See *Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1379; *McKenna, supra*, 215 Cal.App.3d at pp. 1426–1427.)

## C.    The Settlement Did Not Terminate This Action

Sung contends the settlement with her tenant rendered this litigation non-justiciable and moot. We disagree.

Courts must only decide justiciable controversies. (*County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 813.) Justiciability encompasses ripeness and standing. (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1573.) The tenant settlement did not divest the City of standing to pursue its own interests in use restrictions for which it bargained. (See *McKenna, supra*, 215 Cal.App.3d at pp. 1423, 1427; *Ojavan Investors, Inc. v. California Coastal Com.* (1994) 26 Cal.App.4th 516, 519–523, 526.)

"The pivotal question in determining if a case is moot is . . . whether the court can grant the plaintiff any effectual relief." (*Cuenca v. Cohen* (2017) 8 Cal.App.5th 200, 217.) Sung's settlement resolved a dispute with an existing tenant and reserved each party's rights under the Development Agreement. It did not resolve whether the owner-occupancy prohibition or low-income rental requirement applied to Sung's apartment. The

13

tenant settlement did not render the declaratory relief action non-justiciable or moot.

## D.    Attorney Fees

In the second portion of this consolidated appeal, Sung contends the court erred by awarding the City $144,210 in attorney fees.  She disputes the City's entitlement to fees and the amount awarded.

The City was entitled to attorney fees.  Those who prevail on any "action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract" shall be awarded such fees as costs.  (Civ. Code, § 1717, subd. (a).)  "Regardless of the form of the instrument, whether by contract, *deed, or binding equitable servitude*, an instrument containing a provision for the recovery of attorney fees in the event of litigation is governed by the reciprocity provisions of Civil Code section 1717." (*MacKinder v. OSCA Development Co.* (1984) 151 Cal.App.3d 728, 739, italics added.)  The Deed Restriction provides for prevailing party attorney fees.  (Deed Restriction, § 8.)  By enforcing the equitable servitudes against Sung's apartment in this action, the City may recover prevailing party fees from her.  (See *Apex LLC v. Korusfood.com* (2013) 222 Cal.App.4th 1010, 1017; see also Deed Restriction, §§ 6, 14.)

Sung raises four arguments challenging the scope and amount of attorney fees.  We review each for abuse of discretion. (*Lunada Biomedical v. Nunez* (2014) 230 Cal.App.4th 459, 487 (*Lunada*).)

First, Sung contends the court should not have awarded fees because the City was motivated by "[a]nimus."  Sung has

14

forfeited this argument for failing to support it with legal authority or citations to relevant evidence. (*Dilbert v. Newsom* (2024) 101 Cal.App.5th 317, 323.) As discussed, the City prevailed on its "main litigation objective" against Sung. (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 877.)

Second, Sung contends the City failed to properly document time litigating this matter and instead relied on hearsay statements by its lead counsel. We disagree. Lead counsel's declaration, made under penalty of perjury, "constitutes reliable evidence to establish the fees earned . . . ." (*City of Colton v. Singletary* (2012) 206 Cal.App.4th 751, 785.) In it, the City's counsel described his background and calculated the time spent on litigation activities. Such "'after-the-fact time estimates'" properly establish counsel's fees. (*Lunada, supra,* 230 Cal.App.4th at p. 487.)

Third, Sung argues the court should have used the City's lead attorney's salary when calculating attorney fees. The single authority on which she relies, *Serrano v. Unruh* (1982) 32 Cal.3d 621 (*Serrano*), does not support this argument.[7] The lodestar method, which calculates attorney fees based upon hours reasonably expended and a reasonable hourly rate, applies even if the attorney seeking fees did not charge for services. (*Syers Properties III, Inc. v. Rankin* (2014) 226 Cal.App.4th 691, 695–

---

[7] *Serrano* held that "prevailing billing rates of comparable private attorneys" could be used to determine fees for attorneys employed by a public interest firm or agency, rather than their salaries. (See 32 Cal.3d at pp. 640–643.) Sung's appellate brief purports to distinguish *Serrano* when arguing the City "has the burden to show that *Serrano* applies, . . ." It is Sung's burden to affirmatively demonstrate error on appeal. (*Bains v. Moores* (2009) 172 Cal.App.4th 445, 455.)

698, 700–701; *Nemecek & Cole v. Horn* (2012) 208 Cal.App.4th 641, 651.)

Finally, Sung contends the court should have excluded 11.4 hours counsel spent in meetings on the tenant eviction case. Courts need not apportion fees to exclude matters "closely related and involv[ing] the same issues" (*Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 150) and may award fees for actions "'defending against a challenge to the underlying validity of the obligation'" in a contract (*Siligo v. Castellucci* (1994) 21 Cal.App.4th 873, 878). Sung's own justiciability argument above belies her demand for apportionment. We discern no abuse in the trial court's discretion awarding the City $144,210 in contractual attorney fees.

## DISPOSITION

The judgment and post-judgment order are affirmed. The City shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MORI, J.

We concur:

ZUKIN, P. J.

TAMZARIAN, J.

16